BLACKWELL v. BRITISH AMERICAN MTG. CO.

1. LUNATIC—DEMURRER—ANSWER—CAPACITY TO SUE.—The objection that the committee of lunatic has no legal capacity to sue, cannot be raised under a general denial. If it appear on face of complaint, demurrer is remedy; if not, it should be set up as a defense in answer.

2. PRINCIPAL AND AGENT—NOTICE.—Where an attorney sends an application for a loan to a broker, who presents it to a corporation, which agrees to make the loan, and the broker requests the attorney sending the application to make out abstract of title, which he does and forwards to the broker, and on its reception by the corporation the papers for borrower to execute are prepared by the corporation and forwarded to the attorney to have executed and recorded, such attorney is the agent of both the borrower and the lending corporation, and notice to him is notice to the corporation.

3. RECORDING—NOTICE.—A paper subject to record under the acts, although not recorded in time, is notice after record to all subsequent purchasers.

4. EQUITY—MORTGAGES.—Under the facts in this case, the heirs of the vendor of the mortgagor has an equity demanding that the lands held in fee by mortgagor be first sold to satisfy the mortgage debt, and if this does not extinguish the debt, then the lands of such vendor shall be sold to pay any deficiency.

Before GARY, J., Edgeefild, May, 1902.    Modified.

Action by J. R. Blackwell *et al.* against British American Mortgage Company, L. T. and Mollie P. Harmon, and Twin City Power Company. From Circuit decree plaintiffs and the two corporations, defendants, appeal. Plaintiffs on following exceptions:

"1st. Excepts because the Judge erred in not holding that under the agreement between Harmon and Josephine Blackwell she was bound to pay back to Harmon whatever of the loan she received, and that she did pay said sum to him before her death, and before Harmon made the deed to the British American Mortgage Company, Limited, and that the British and American Mortgage Company had notice of it, or if it did not it was the company's own fault.

"2d. Excepts because his Honor erred in holding that out of the plaintiff's one-half interest in the 1,309 acre tract of land must be paid $1,286.66 to British and American Mortgage Company, Limited, when he ought to have held that the evidence shows that Josephine Blackwell had paid all she owed before her death to L. T. Harmon, and the British and American Mortgage Company, Limited, had notice, or ought to have known it, before it took and accepted Harmon's deed to the land."

Defendants on following exceptions:

"1. Excepts because the presiding Judge erred in holding that the plaintiff, John R. Blackwell, had been duly and legally appointed the committee of the lunatic, Susie Blackwell. Whereas, it is submitted that the record in evidence of the appointment of such committee by the probate court for Edgefield County shows that said court had never acquired jurisdiction to make such appointment, and that such proceedings were invalid and void, in that it appears that no summons had been issued by said Court or served upon the said lunatic, and no hearing was had before the said court, and that the said Blackwell was appointed committee upon the filing of a petition without any further proceedings therein.

"2. Excepts because the presiding Judge erred in his finding of facts that Mr. A. S. Tompkins, at the time of the application by Harmon for a loan, was representing the British and American Mortgage Company, Limited. Whereas, it is submitted that the evidence shows conclusively that the said Tompkins was not at that time the agent or representing the British and American Mortgage Company, Limited, or at any time preceding the actual loan of the money to Harmon, or at the time the loan was made and the papers executed and for some time thereafter.

"3. Excepts because the presiding Judge erred as a matter of fact in his finding that the said Tompkins drew all papers necessary to perfect the loan. Whereas, it is submitted the testimony conclusively shows that the defendant mortgage

company drew its own papers, which it considered necessary to perfect the loan, and had no knowledge whatsoever of any agreement made between Josephine Blackwell and L. T. Harmon.

"4. Excepts because the presiding Judge erred in finding as a matter of fact that the said Tompkins drew the agreement set out in his decree and dated day of 1890. Whereas, it is conclusively shown by the testimony that this paper was drawn by Mr. Tompkins, but was not signed and executed by Blackwell and Harmon, or witnessed or delivered in his presence, and that he never had any knowledge or notice that such paper was so signed and executed or delivered until after the conveyance by Harmon and his wife to the mortgage company.

"5. Excepts because the presiding Judge erred in holding that the alleged agreement between L. T. Harmon and Josephine Blackwell, set out as an exhibit to the complaint, was simultaneously executed with the deed from Josephine Blackwell to L. T. Harmon of her one-half interest in the 1,309 acres of land, when the date of the two papers and all the legal evidence and facts show to the contrary.

"6. Excepts because the presiding Judge erred in finding as a matter of fact that the two transactions were made simultaneously at the suggestion and with the consent of Mr. A. S. Tompkins. Whereas, the testimony in the case conclusively shows that Mr. Tompkins had no knowledge whatsoever, until years after, of the execution of the said agreement.

"7. Excepts because the presiding Judge erred in not ruling out, on the objection of the defendant mortgage company, the evidence of John R. Blackwell (objected to by the mortgage company) as to the statements of A. S. Tompkins. The same being an attempt to prove agency by the acts and declarations of the very person whose agency is the question at issue, and also all testimony showing any transaction between John R. Blackwell and his wife, Josephine, and all testimony of L. T. Harmon contradicting his acts

under seal and his testimony as to the transaction between him and Josephine Blackwell, now dead.

"8. Excepts because the presiding Judge erred in holding as a fact that the Twin City Power Company was before the Court as simply having an option to purchase at a stated price the lands described in the complaint. Whereas, the testimony shows that the Twin City Power Company had paid on its option, and without notice of any outstanding claim or demand of the Blackwells, and had expended large sums of money in locating a water power, as set out in the testimony, which shows that the expenditure of said Twin City Power Company, relying upon the title of the mortgage company and its contract of purchase with said company, was of a much larger sum than the said purchase money.

"9. Excepts because the presiding Judge erred in concluding, as a matter of law, that A. S. Tompkins, at the time of the execution of the deed from Josephine Blackwell to L. T. Harmon, was the agent and attorney for the British and American Mortgage Company, Limited. Whereas, it is conclusively shown by the testimony that he was not such agent, and had no dealings or transactions with said company, but, on the contrary, was acting as the attorney of the said L. T. Harmon.

"10. Excepts because the presiding Judge should have held that at the time of the execution of the mortgage by L. T. Harmon to the defendant mortgage company, it had no knowledge, notice or information whatsoever of the execution and existence of the alleged agreement between Harmon and Mrs. Blackwell, and that at the time of the execution of the said mortgage and the advancing of the money, the said Tompkins had no knowledge of the execution and delivery of such paper, and that the drafts for the $2,000 and $2,700 was prepared by A. S. Tompkins, signed by L. T. Harmon, and forwarded to Shattuck & Hoffman for Harmon to receive the proceeds thereof.

"11. Excepts because the presiding Judge erred in holding that the deed of Josephine Blackwell and the defeasance are

all one transaction and constitute a mortgage as between Josephine Blackwell and L. T. Harmon. Whereas, it is submitted that said agreement does not constitute a mortgage, but a simple contract to reconvey upon the condition therein stated.

"12. Excepts because the presiding Judge erred in holding that L. T. Harmon, only having a mortgage over the land of Josephine Blackwell, conveyed no greater interest than he had, and having concluded that the British and American Mortgage Company, Limited, had notice of the transaction between Josephine Blackwell and L. T. Harmon, they acquired this land subject to the right of plaintiff to have the same declared a mortgage. Whereas, he should have held that as to the mortgage company, it had no notice whatsoever of the said agreement, and that the conveyance by Mrs. Blackwell to Harmon was absolute and unconditional, and conveyed all of her right and title thereto without any reservation, and that when the mortgage company received the mortgage made by Harmon covering said land, that it was in no way affected by any transaction had between Harmon and Mrs. Blackwell not expressed in said conveyance by her to him.

"13. Excepts because the presiding Judge erred in holding that the Twin City Power Company was not in a position to plead that it is a purchaser without notice and has not paid the purchase money. Whereas, it is submitted that on account of the payment of the $1,000 and the outlay of money, without any notice whatsoever of any right of Mrs. Blackwell or her heirs or representatives to make any claim to an interest in said land, it was in a position to defend its contract as a purchaser without notice and for valuable consideration.

"14. Excepts because the presiding Judge erred in adjudging that the deed executed by Josephine Blackwell to L. T. Harmon is a mortgage, and that the deed executed by L. T. Harmon and Molly P. Harmon to the mortgage company, in so far as it purports to convey the fee simple title to the

interest of Josephine Blackwell in said land, be set aside. Whereas, he should have held and adjudged that the money advanced by the defendant mortgage company, and the mortgage securing the same, was without notice of any right or claim of Mrs. Blackwell or her heirs and representatives to any interest in the 1,309 acres of land, and that the deed executed by L. T. Harmon to Molly P. Harmon was for valuable consideration, without any notice of any claim of Mrs. Blackwell, and that at the time of the execution of the deed of conveyance made by L. T. Harmon and Mollie P. Harmon to the mortgage company it was without notice of any claim of Mrs. Blackwell, and that they conveyed a fee simple title in and to all of said land formerly owned by Mrs. Blackwell; and that the heirs and representatives of Mrs. Blackwell cannot now set up such claim as against the mortgage company and the Twin City Power Company, with whom it has a contract to sell and convey said premises.

"15. Excepts because the presiding Judge erred in not construing the agreement between Josephine Blackwell and L. T. Harmon to be a conveyance to Josephine Blackwell of certain right for her life only, and died with her, and cannot pass to these plaintiffs, her heirs, the word 'heirs' nowhere occurring in said agreement after Josephine Blackwell's name.

"16. Because John R. Blackwell, in his own right and as administrator, and his children are estopped from objecting to the sale by L. T. Harmon and Molly P. Harmon to the said mortgage company of the land in dispute, Josephine Blackwell being at that time alive, and had notice of the sale and the existence and execution of the deed through her husband, John R. Blackwell, her agent, pending the negotiation and consummation of said sale, and no objection being made until after the death of Josephine Blackwell and until after the Twin City Power Company began to develop that section by large investments and improvements.

"17. Excepts because the presiding Judge did not hold that the plaintiffs are barred by the statute of limitations, as

it appears from the filing of the complaint that none of the plaintiffs, their ancestors, predecessors or grantors, were seized and possessed of the premises in question within ten years before the commencement of this action, and that so far as the mortgage company and the power company are concerned, they and their grantors have been in adverse possession of the land in dispute for more than ten years before the commencemnt of this action.

"18. Excepts because the presiding Judge did not hold that the $5,000 mortgage from L. T. Harmon to the British and American Mortgage Company, Limited, bearing date of the 4th day of March, 1890, being left open in the deed from Harmon to the said company, bearing date the 15th day of March, 1889, all lands embraced therein should stand good for all the said debt.

"19. Excepts because the presiding Judge did not, upon all the testimony in the case, conclude as matter of law, and so adjudge, that the complaint should be dismissed."

*Mr. N. G. Evans,* for plaintiffs, cites: *Probate court has jurisdiction of appointment of committee to lunatic:* 18 S. C., 123; Code, 37. *As to notice to loan company through Tompkins:* 44 S. C., 483; 33 S. C., 233; 10 S. C., 388; 58 Vt., 113; 37 S. C., 89; 7 Rich. Eq., 54; 1 Speer's Eq., 159; 1 Ency., 419; 3 Strob. Eq., 159; 11 S. C., 408; 16 Ency., 787; 112 N. Y., 637; 115 Ill., 289. *Deed of Mrs. B. to H. was a mortgage:* 21 S. C., 400; 1 McM. Eq., 2; 13 Rich. Eq., 222; 20 S. E. R., 591; 16 Ency., 1 ed., 793; Paw. on Mtg., 67; 20 Am. Dec., 147. *As to construction of deed to reconvey:* 5 Ency., 511; 20 S. C., 429; 6 S. C., 484; 59 S. C., 148. *Power company is not bona fide purchaser for value:* 14 S. C., 312; 6 Rich. Eq., 155; 23 S. C., 494; 2 Strob. Eq., 203. *Time will not run in favor of defendant in fraud until notice to plaintiff:* 120 U. S., 130; 11 Wall., 442; 13 Ency., 682.

*Mr. J. W. DeVore,* also for plaintiffs, cites: *Notice to*

*Tompkins is notice to loan company:* 44 S. C., 478. *Defeasance need not bear same date as deed, but must be delivered at same time:* 13 Pick., 411; 7 Watts, 401; 5 Ency., 1 ed., 511. *Blackwell deed is a mortgage:* 1 Jones on Mtg., 168; 3 Pom. Eq., 1335, 1237; 53 Ohio St., 414; 21 S. C., 400. *Requisites to plea of bona fide purchaser:* 14 S. C., 318, 90.

*Messrs. Tompkins & Wells,* for defendants, appellants, cite: *Circuit Court should have appointed committee to lunatic:* 18 S. C., 123; 15 S. C., 97; Code, 155, 156. *As to agency of Tompkins:* 7 S. E. R., 266. *Plaintiffs are estopped from denying title:* 57 S. C., 472; 47 S. C., 488. *Nor can they change it by parol:* 1 McM., 467; 1 Speer, 192. *Agency cannot be shown by acts and declarations of agent:* 44 S. C., 91; 39 S. C., 535. *Agreement to reconvey only carried life estate of Mrs. B.:* 42 S. C., 68. *The loan company is an innocent purchaser for value without notice:* 36 S. C., 343; 14 S. C., 318. *And specific performance will not be decreed:* 1 Bail. Eq., 347; 2 DeS. Eq., 172; 24 S. C., 33; 53 S. C., 563. *Plaintiffs are guilty of laches in not sooner asserting their rights:* 31 S. C., 280; 24 S. C., 98; 34 S. C., 535; 20 S. C., 52; 53 S. C., 126; 22 Ency., 936, 1028, 1029. *No merger having taken place, all the land must be applied to mortgage debt:* 24 S. C., 18; 26 S. C., 411; 47 S. C., 299; 57 S. C., 182.

January 10, 1902. The opinion of the Court was delivered by

MR. JUSTICE GARY. The facts of this case are thus stated in the decree of his Honor the Circuit Judge: "The facts as I gather them are briefly as follows: The plaintiff, John R. Blackwell, and the defendant, L. T. Harmon, were neighbors, and were, during the year 1889, farming together on lands of L. T. Harmon, and also on lands belonging to the wife of the said John R. Blackwell, the intestate, Josephine Blackwell. It appears that the said Harmon and Blackwell

were unsuccessful in their farming, and owing to short crops became indebted. In fact, this farming enterprise was so unprofitable that Blackwell found it necessary to borrow money with which to liquidate the indebtedness incurred in operating this farm. At this time, Mr. A. S. Tompkins, a member of the Edgefield bar, was advertising in the county papers that he had money to lend on real estate as a security. The said Blackwell and Harmon, seeing this advertisement, applied to Mr. Tompkins for a loan of $5,000, agreeing to secure this amount by mortgage of real estate of L. T. Harmon as well as the lands of Josephine Blackwell. At this time Mr. Tompkins was representing the British and American Mortgage Company, Limited. He drew all the papers necessary to perfect this loan and drew the agreement between Josephine Blackwell and L. T. Harmon, which is as follows: 'State of South Carolina, County of Edgefield. Whereas, Josephine Blackwell did, on the 22d day of December, 1889, convey to L. T. Harmon a one-half interest in all that tract of land, in Edgefield County, containing thirteen hundred and nine acres, more or less, bounded by lands of Rebecca Tucker, Jeff Wells, W. W. Finley and Savannah River, for the purpose of obtaining a loan on same and for divers considerations. Now, it is understood and agreed by Josephine Blackwell and L. T. Harmon that when the said Josephine Blackwell shall pay or cause to be paid to L. T. Harmon or his legal heirs or representatives one-third (1-3) of the amount borrowed, then the said L. T. Harmon hereby binds his heirs, executors and administrators to convey unto Josephine Blackwell the above described one-half interest in said land. Witness our hand and seals, this day of    , A. D. 1890. Josephine Blackwell. [L. S.] L. T. Harmon. [L. S.] Witness: Susan Searles, J. R. Blackwell, John Brunson.'

"That Josephine Blackwell departed this life some time during the year 1900, leaving as heirs at law her husband, John R. Blackwell, and six children, as set out in the complaint. That John Blackwell is duly appointed administra-

8—65

tor of Josephine Blackwell. That Susie Blackwell, one of
the children, has been adjudged a lunatic, and John R.
Blackwell has been duly appointed her committee, and that
J. P. Blackwell, Mattie Cartledge and Celia M. Blackwell
are minor children, and sue by their guardian *ad litem,* John
R. Blackwell. At the time of the execution of the said deed
by Mrs. Blackwell to Harmon to her one-half in 1,309 acres
of land, Harmon executed to her the agreement above set
forth. These two transactions were made simultaneously
at the suggestion and with the consent of Mr. A. S. Tomp-
kins. Of the amount advanced by the defendant mortgage
company, Josephine Blackwell received the sum of $1,566.66,
and, of course, is liable to said company, and her land
stands pledged to secure the payment of that sum, after de-
ducting any payments she may have made direct to said
mortgage company. It further appears that on the 24th day
of October, 1893, the said L. T. Harmon conveyed his own
half interest in the land covered by the lien of the said mort-
gage to his wife, Mollie P. Harmon. And that on the 15th
day of March, 1899, the said L. T. Harmon and his wife,
Mollie P. Harmon, conveyed said land to the said mortgage
company in liquidation of the amount advanced by said
company and secured by mortgage of their lands. It also
appears that subsequent to the execution of the deeds of
the Harmons to the mortgage company, the defendant, the
Twin City Power Company, procured what is commonly
known as an option from the defendant company for the
purchase of this Harmon land, through its agent, W. H.
Chew, who had no actual notice at the time of the defeasance
above set out between Josephine Blackwell and L. T. Har-
mon, executed in 1890. The Twin City Power Company
has never perfected its purchase, and is before the Court as
simply having an option to purchase at a stated price. The
object of this suit is to have the deed from Josephine Black-
well to L. T. Harmon declared to be a mortgage on the
undivided one-half interest of the said Josephine Blackwell
in said lands and the same to be marked settled."

His conclusions of law are as follows: "That A. S. Tompkins, at the time of the execution of the deed from Josephine Blackwell to L. T. Harmon, was the agent and attorney for the British and American Mortgage Company, Limited, and having advertised and, in fact, drafted the defeasance therein set forth, had actual knowledge of the transaction. And knowledge to the agent was knowledge to his principal, the British and American Mortgage Company, Limited. That the deed of Josephine Blackwell and the defeasance are one transaction, and constitute a mortgage as between said Josephine Blackwell and L. T. Harmon. That L. T. Harmon only having a mortgage over the land of the said Josephine Blackwell, could convey no greater interest than he had, and having concluded that the British and American Mortgage Company had notice of the transaction between Josephine Blackwell and L. T. Harmon, they acquired this land subject to the right of the plaintiff to have the same declared a mortgage. That the Twin City Power Company is not in a position to plead that they are purchasers without notice, having reached the conclusion that its interest is only an option. It has not paid the purchase money, a necessary prerequisite to sustain such plea. In so far as the plaintiffs are concerned, it is simply in the shoes of the mortgage company.

"It is, therefore, adjudged that the deed executed by Josephine Blackwell to L. T. Harmon is a mortgage, and that the deed executed by L. T. and Mollie P. Harmon to the British and American Mortgage Company, Limited, in so far as it purports to convey the fee simple title to the interests of Josephine Blackwell in said land, is set aside. My conclusion being that said deed is simply an assignment of the interest of L. T. Harmon, which I have concluded to be a mortgage.

"Having, therefore, concluded that Josephine Blackwell received from the mortgage company the sum of $1,566.66, the interest she had in the land is pledged to the mortgage company for that amount, less her payment to said company,

which I find to be $280, she having paid the sum to the company on the 4th December, 1897, which amount, deducted from the original amount, would leave a balance of $1,286.66 still due.    It appears that the interest on the gross sum of $5,000 was paid by Harmon."

The defendant appealed upon numerous exceptions, which will be incorporated in the report of the case.    The question presented by the first exception is, in effect, an objection that the plaintiff, Susie Blackwell, did not have legal capacity to use, and arises properly under subdivision 2, section 165, of the Code.  *Dawkins* v. *Mathis,* 47 S. C., 64; *Palmetto Co.* v. *Risley,* 25 S. C., 309; *Steamship Co.* v. *Rodgers,* 21 S. C., 27; *Commercial Co.* v. *Turner,* 8 S. C., 107.  The defendant cannot take advantage of this objection under a general denial, but demurrer was the proper remedy when the objection appears upon the face of the complaint; and when it does not so appear, the appropriate remedy is to set up the objection as a defense in the answer.    In either case, the defendant is required to specify distinctly the grounds of the objection.    *Palmetto Co.* v. *Risley,* 25 S. C., at page 315.    If no such objection be taken either by demurrer or answer, the defendant shall be deemed to have waived the same. Code of Proc., sec. 169.    This exception is overruled.

The defendants in their argument say: "The keystone to this whole case is, whether his Honor, Judge Gary, is correct from the testimony, in his finding as conclusion of law, that A. S. Tompkins, at the time of the execution of the deed (to wit: on the 22d day of December, 1889), from Josephine Blackwell to L. T. Harmon, was the agent and attorney for the British and American Mortgage Company (Limited)."    We proceed to consider this question.    The presumption is in favor of the Circuit Judge's finding of fact, and the burden rests upon the appellant to show, by a preponderance of the testimony, that it is erroneous.    The fact of agency may be inferred from circumstances as well as shown by direct testimony.    Conceding the

fact that A. S. Tompkins and Shattuck & Hoffman were the agents of Harmon, it does not follow that they were not also the agents of the British and American Mortgage Company. · Charles P. Rowland, the cashier of the mortgage company, testified as a witness in behalf of the company, as follows: "Q. 7th. What is its usual mode and course of business   A. 7th. The mortgage company receives applications for loans from individuals, brokers or any reputable source.   We accept, decline or modify such applications, lending an amount which we think justified by the security. We prefer to deal with brokers whom we know by reputation to be trustworthy, because they are familiar with the class of security we demand and accustomed to our method of doing business.   When applications are accepted, an abstract of title is furnished, which is submitted to our attorney, and if he approves it the notes and mortgages are drawn under his direction.   The notes and mortgages are then executed by the borrower, and when delivered to us we pay the money to the broker or individual who presented to us the application.   We do not employ any agents for securing loans nor for any other purpose.   If any reputable person sends an application, we will consider it if we are satisfied with the standing of the person presenting it to us.   Q. 8th. Does the British and American Mortgage Company, Limited, employ agents for the negotiations of loans?   A. 8th. No; the mortgage company never employed agents for the negotiations of loans.   Q. 9th. Did your company make a loan to L. T. Harmon, of Edgefield, S. C.?   A. 9th.   Yes."

F. B. Hoffman, a member of the firm of Shattuck & Hoffman, another witness in behalf of the company, testified as follows: "Q. State in a general way how your business as loan brokers was carried on, and particularly how this L. T. Harmon loan was negotiated?   A. The firm of Shattuck & Hoffman acted as loan brokers.   They received applications from attorneys at law or other persons acting for their clients for loans of money on lands.   Shattuck & Hoffman submitted these applications to any persons or corporations whom

they knew had money to lend, and if they were successful in negotiating the loan, so notified the attorney or person who sent the applications to them.   The abstract of title would then be prepared by the local attorney and sent to Shattuck & Hoffman.   They submitted it to the party from whom they proposed to obtain the money on the application, and if the title was satisfactory, the lender would prepare such papers as they desired executed by the borrower, deliver such papers to Shattuck & Hoffman, who would forward them to the attorney or agent for the borrower.   When the notes and mortgages were executed and the mortgage filed for record, the notes were sent to Shattuck & Hoffman, with a certificate showing that the mortgage had been filed for record, and the borrower drew his draft on Shattuck & Hoffman for the money due him on the loan.   Shattuck & Hoffman delivered the notes to the lender and obtained the money on the loan.   The loan to Harmon was made strictly in accordance with the usual custom, as outlined above."

It will be seen from the foregoing testimony that when an application for a loan was submitted to the company and accepted, every detail thereafter, necessary for its information in determining whether the abstract of title was satisfactory, and in perfecting the negotiations for the loan, when the abstract of title was found to be satisfactory, was entrusted to attorneys who, the company contends, only represented the party making the application.   This would be in violation of the business methods practiced throughout the world, and the fact that all these details are confided to attorneys representing the applicant, can reasonably be accounted for, only on the hypothesis that they are likewise the agents of the lender.   If the lender had no further dealings in such transaction with the attorneys making the application for a loan, after it was accepted, it might be contended with greater force that they were not the agents of the company in the first instance.   The business of the company was such as necessarily compelled it to rely upon the work of other parties and this necessity usually and naturally gives rise to

the employment of agents. When, therefore, this work is done by others, there is a strong implication that they are the agents of the parties receiving the benefit of their services. We do not think the implication in this case is overcome by the testimony. If the company had strenuously endeavored to invent a scheme by which it could escape all liability growing out of the acts of those agents whom necessity compelled it to employ in conducting the business of making loans, we are satisfied that it could not have devised one more nearly accomplishing this purpose. Our conclusion is that the attorneys negotiating the loan were the agents, both of the borrower and the lender, as each entrusted them with the performance of certain duties, which reason dictates they, or at least the lender, would have confided only to those whom they had respectively selected to represent them. The two cases principally relied upon by the appellant's attorneys to sustain a contrary conclusion are *New England Co.* v. *Baxley,* 44 S. C., 81, 21 S. E. R., 885, and *Merck* v. *Am. F. L. Mtge. Co.,* 7 S. E. R. (Ga.), 265. In the case first mentioned, Mr. Chief Justice McIver, who delivered the opinion of the Court, called attention to the fact that the Circuit Judge made no finding upon the question whether the parties in that case, who negotiated the loan, were the agents of the lender. And, in the other case, the Court says: "But grant that the middle-men were by legal implication agents of both parties, the lender as well as the borrower, for several purposes, such as receiving and delivering papers, inspecting the property, examining the title, &c., it is certain, according to the evidence in the record, that they were not agents, express or implied, for making the loan, fixing the terms of it, or accepting the security." Thus showing that the question of agency arising out of the facts of the case under consideration was not the turning point in the Georgia case. In both of said cases the question of agency was only incidentally involved—the main question in each of them being that of usury. Having reached the conclusion that the said attorneys were likewise the agents of the company as

to the matters intrusted to them by the respective parties, it follows that the knowledge acquired by Mr. Tompkins while investigating the title and papers of the company was binding on it.   *American Co.* v. *Felder,* 44 S. C., 478, 22 S. E. R., 598.   We do not deem it necessary to cite the other cases in this State sustaining the principle announced.

There is another reason why it must be construed that the Twin City Power Company, as well as the British and American Mortgage Company, had notice of the agreement between Harmon and Mrs. Blackwell.   "Exhibit 2" is the agreement between Mrs. Blackwell and Harmon, which is set out in the decree of the Circuit Judge.   It was not recorded, but "Exhibit K" was recorded, and it is identical with "Exhibit 2," except it bears date on the 22d day of December.   The following probate and indorsements appear on "Exhibit K:"

"Personally appeared before me, J. R. Blackwell, who makes oath that he saw the within named L. T. Harmon and Josephine Blackwell sign, seal and deliver the foregoing instrument to Josephine Blackwell, for the purposes therein contained, and that he, with John Brunson and Susan Searles, witnessed the due execution thereof.   Sworn to before me this 22d day of December, 1893.   (Signed) J. R. Blackwell.   (Signed) John Brunson, [L. s.] T. J. E. C. C. D.   Recorded November 14th, 1893.   John B. Hill, R. M. C."

J. R. Blackwell in his testimony thus explains these two papers: "Q. Paper shown the witness marked 'Exhibit 2,' and asked if that was the origiinal?   A. Yes.   Q. Did you make a copy of the original?   A. Yes.   Q. Is that the copy you made (showing exhibit K)?   A. Yes.   *Q. Was that signed by the original parties as witnessed and signed by the witnesses?   A. It was* (italics ours).   Q. What is the difference between those two papers?   A. The only difference is in the date.   Q. Any difference in the year?   A. No difference.   Q. In what part of date do the papers differ?   A. In the day and month.   Q. You explain the date of this

paper?   A. The only reason that can account for why that date, the 22d of December, 1890, is in the copy, is that it is a mistake, and the only reason that I can account for it is that I took the date written in the beginning of the paper. *Q. Is the 22d of December, 1890, the date that the paper was signed?*   A. No. (italics ours).   Q. Is there any circumstance, Mr. Blackwell, by which you can recall about the date of the signing of that paper?   *A. It was some time in January, 1890* (italics ours).   As I stated, in January, 1890, when I carried the deed home and had them sign it, and brought back the papers to Mr. Tompkins and had them to sign up both papers, Mr. Tompkins said they were all right, and the reason why I say in January, for we did not get the money until March, and these papers were drawn and passed between the parties before we got the money or before the mortgage was signed by Mr. Harmon.   Q. Why did you make a copy of the original agreement drawn by Mr. Tompkins?   A. The reason was that I drew the deed; I thought the agreement had better be in my handwriting." "Exhibit K" is such a writing as is contemplated in the recording acts, and although not recorded within the time required by law, nevertheless, from the date of its record, it operated as notice to those subsequently thereto becoming purchasers of the property therein described.

It is not necessary to consider the question raised by the other exceptions in detail, as the findings and conclusions of the Circuit Judge for the reasons assigned by him are satisfactory to this Court.

The plaintiffs also appealed, and their exceptions will likewise be set out in the report of the case.   These exceptions will be considered together.   It was the intention of all the parties to the transaction that the mortgage executed in favor of the British and American Mortgage Company should be paramount to the rights of Mrs. Blackwell.   The company, therefore, is entitled to a judgment of foreclosure against all the parties to the transaction or their representatives, and to collect the amount now due

out of all the property described in the mortgage. In the record there are six receipts from L. T. Harmon to Josephine Blackwell, showing that the following amounts were paid by her: "No. 1 is for $550, dated November 18, 1890; No. 2, for $375, paid December 3d, 1891; No. 3 is $393.20, December 22, 1893; No. 4, for $315, November 20th, 1895; No. 5 is for $136, December 14, 1896; No. 6 is for $290, December 25th, 1897. The representatives of Mrs. Blackwell, therefore, have an equity demanding that the property belonging to Harmon, in which Mrs. Blackwell had no interest, should first be sold, and if the proceeds arising from the sale are not sufficient to pay the amount now due, then the other property described in the mortgage should be sold to satisfy the amount remaining unpaid after applying the proceeds arising from the first sale towards the extinguishment of the indebtedness mentioned in the mortgage.

It is the judgment of this Court, that the judgment of the Circuit Court be modified, and the case remanded to that Court for such further proceedings as may be necessary to carry into effect the conclusions herein announced.