## STATE v. VIRGINIA-CAROLINA CHEMICAL CO.

1. TRUSTS—POLICE POWER—CONSTITUTION.—SEC. 2845, CODE 1902, is not in violation of section 1, of article XIV., in amendment of the U. S. Constitution, as it is an exercise of the police power in defining, limiting, governing or destroying trusts, monopolies and combinations in restraint of trade.

2. IBID.—FOREIGN CORPORATIONS — CONTRACTS—CONSTITUTION.—Under the statute law of this State authorizing foreign corporations to do business in this State under certain conditions, requiring that such corporations shall be subject to the laws governing domestic corporations, a foreign corporation accepting this privilege is not deprived of any of its rights under State and Federal Constitutions prohibiting the passage of laws impairing the obligations of contracts, by an act tending to deprive it of the right to do business in this State because its business is a monopoly and in restraint of free competition in trade.

3. IBID.—CONSTITUTION—POLICE POWER.—So much of an act of this State as prohibits the importation into and sale of articles in the State with a view to lessen, or which tends to lessen full and free competition is an attempt by the State to exercise the prerogative of Congress to regulate interstate commerce and can not be sustained under the police power.

4. IBID. — CONTRACTS — PUBLIC POLICY. — The agreements, contracts, trusts and combinations enumerated in sec. 2845 of Code of 1902, and therein declared to be against public policy, unlawful and void, are only so when made with a view to lessen, or when they tend to lessen full and free competition to an unreasonable degree. The allegations in this complaint that the appellant has had transferred to it all the other defendant corporations that were independently engaged in the manufacture and sale of fertilizers in this State, and has acquired all others except four; that it has ac-

quired a large proportion of the phosphate lands of the State; that it controls a majority of the stock in a large manufacture of fertilizer ingredient; that it owns and controls such corporations in adjoining States; and that covenants were entered into between appellant and some of the other defendants not to engage thereafter in the manufacture and sale of fertilizers for a greater or less period within the State, states a cause of action under the statute.

Before Gary, J., Richland. Affirmed.

Action by State of South Carolina against Virginia-Carolina Chemical Co., Imperial Fertilizer Co., Standard Fertilizer Mfg. Co., Chicora Fertilizer Co., Berkeley Chemical Co., Greenville Fertilizer Co., Columbia Phosphate Co., Carolina Sulphuric Acid Manufacturing Co., Blacksburg, on the following complaint:

"The plaintiff, by G. Duncan Bellinger, Esq., its duly qualified attorney general, complaining of the defendants above named, alleges:

"1st. That on the 13th day of February, A. D. 1900, the General Assembly of South Carolina adopted the following joint resolution: 'Section 1. Be it enacted by the General Assembly of the State of South Carolina, that the Attorney General of the State of South Carolina be, and he is hereby, instructed and required to forthwith institute an investigation to determine by what authority the Virginia-Carolina Chemical Company is doing business in this State, whether said company and all other foreign corporations have complied with the laws of this State, regulating foreign corporations, and whether said company, or any person or corporation who may be engaged in any business within this State, has violated or is violating the provisions of the laws of this State prohibiting trusts and combinations, and that he institute such proceedings, civil or criminal, as may be necessary to prevent and punish the violations of such laws against trusts and combinations.'

"2d. That the Virginia-Carolina Chemical Company is a

35—71

corporation created under and by virtue of the laws of the State of New Jersey, and by its certificate of incorporation, dated 12th day of September, 1895, the purpose and object of said corporation as set forth in said charter are as follows : 'The objects for which the company is formed are to carry on the business of buying, manufacturing and selling chemicals, paints, varnishes, drugs, fertilizers and all materials or articles used or capable of use in the manufacture, preservation, packing and transportation of each, any and all of said products, and of purchasing, leasing or otherwise acquiring and using, operating, caring for and disposing of any such business or businesses, now established or hereafter established, and the property and good will connected therewith, and also any mines, manufactories, plants, machinery, appliances, tools, supplies, materials, patents, trade marks, copyrights, brands, formulas and any other real or personal property, rights and privileges of any nature whatsoever, suitable, convenient or necessary for any of the purposes aforesaid, or hereinafter stated, or which can lawfully be used in connection therewith, and of establishing agencies and warehouses for the storage, sale and distribution of the company's products and similar products of other manufacturers and dealers, and of transporting or causing the transportation of such products as articles of commerce, and the doing of any other similar or different business and things incidental to, or which may lawfully and conveniently be done in conjunction with any of the matters aforesaid.

" 'The portion of the business of said company which is to be carried on out of this State, and in the States and countries above mentioned, is to carry on the business of buying, manufacturing and selling chemicals, paints, varnishes, drugs, fertilizers and all materials or articles used, or capable of use, in the manufacture, preservation, packing and transportation of each, any and all of said products, and of purchasing, leasing or otherwise acquiring and using, operating, caring for and disposing of, any such business or businesses, now established or hereafter established, and the

property and good will connected therewith, and also any mines, manufactories, plants, machinery, appliances, tools, supplies, materials, patents, trade marks, copyrights, brands, formulas and any other real or personal property, rights and privileges of any nature whatsoever, suitable, convenient or necessary for any of the purposes aforesaid, or hereinafter stated, or which can lawfully be used in connection therewith, and of establishing agencies and warehouses for the storage, sale and distribution of the company's products and similar products of other manufacturers and dealers, and of transporting, or causing the transoprtation of such products as articles of commerce, and the doing of any other similar or different business and things incidental to, or which may lawfully and conveniently be done in connection with any of the matters aforesaid, to the extent that all the above mentioned matters must necessarily, or can conveniently or advantageously to the company, be transacted out of the State of New Jersey.'

"That the capital stock of said corporation, as appears by said certificate, is $6,500,000, divided into 65,000 shares, of the par value of $100 each, of which said stock $4,000,000 was general or common stock, and $2,500,000 was preferred stock.

"That it appears by a certificate of increase of capital stock, dated 21st day of July, A. D. 1898, and filed in the secretary of State's office of New Jersey, that the common stock of said corporation was increased to $6,000,000. and the preferred stock to $6,000,000, making the total amount of capital stock $12,000,000.

"That it appears by a certificate of increase of capital stock, dated 20th day of July, A. D. 1899, and filed in the secretary of State's office of New Jersey, the common stock of said corporation was increased to the amount of $12,000,000, and the amount of preferred stock to $12,000,000, making the total capital stock of said corporation $24,000,000, and plaintiff is informed and believes the capital stock has since been increased to $50,000,000.

"That on the 22d day of January, 1900, the charter of said company and amendments thereof was filed in the office of the secretary of State of South Carolina, and it received authority to do business in this State under and in accordance with sections 1465-1471, inclusive, of the Revised Statutes of South Carolina, and has since been doing business and acquiring property in this State, and continues to do so, and owns property and does business in the county of Richland, as well as in nearly all of the counties of this State.

"3d. That the Imperial Fertilizer Company is a corporation created under the laws of the State of South Carolina, and incorporated to manufacture and sell commercial fertilizers.

"4th. That the Standard Fertilizer Manufacturing Company is a corporation created under the laws of the State of South Carolina, and incorporated to manufacture and sell commercial fertilizers.

"5th. That the Chicora Fertilizer Company is a corporation created under the laws of the State of South Carolina, and incorporated to manufacture and sell commercial fertilizers.

"6th. That the Berkeley Chemical Company is a corporation created under the laws of the State of South Carolina, and incorporated to manufacture and sell commercial fertilizers.

"7th. That the Greenville Fertilizer Company is a corporation created under the laws of the State of South Carolina, and incorporated to manufacture and sell commercial fertilizers.

"8th. That the Carolina Sulphuric Acid Manufacturing Company, Blacksburg, Cherokee County, is a corporation created under the laws of the State of South Carolina, and incorporated to manufacture sulphuric acid essentially used in the manufacture of commercial fertilizers.

"9th. The Columbia Phosphate Company is a corporation created under the laws of South Carolina and incorporated to manufacture and sell commercial fertilizers.

"10th. That on the 25th day of February, 1897, the General Assembly of South Carolina passed an act entitled, 'An act to prohibit trusts and combinations and to provide penalties,' which said act was by the General Assembly amended on the 19th day of February, 1898.   The first section of the last named act is as follows: 'Section 1. Be it enacted by the General Assembly of the State of South Carolina, That from and after the passage of this act all arrangements, contracts, agreements, trusts or combinations between two or more persons as individuals, firms or corporations made with a view to lessen, or which tends to lessen, full and free competition in the importation or sale of articles imported into this State, or in the manufacture or sale of articles of domestic growth, or of domestic raw material, and all arrangements, contracts, agreements, trusts or combinations between persons or corporations, designed or which tend to advance, reduce or control the price or cost to the producer or to the consumer of any such product or article, and all arrangements, contracts, trusts, syndicates, associations or combinations between two or more persons as individuals, firms, corporations, syndicates or associations, that may lessen or effect in any manner the full and free competition in any tariff, rates, tolls, premiums or prices, or seeks to control in any way or manner such tariffs, rates, tolls, premiums or prices in any branch of trade, business or commerce, are hereby declared to be against public policy, unlawful and void.'

"11th. That all the defendants hereto except the Virginia-Carolina Chemical Company were at the times hereinafter specified independently engaged in the manufacture and sale of fertilizers in South Carolina, and which had become necessary to and was universally used by the farmers of said State in the cultivation and production of their crops.

"12th. That the Virginia-Carolina Chemical Company was organized by a combination of capitalists and other persons under the guise of a comprehensive charter for the purpose of monopolizing the manufacture and sale of commercial fertilizers in the State of South Carolina and adjoining

States, and its capital stock increased from time to time to enable it to accomplish this purpose and suppress full and free competition therein to the great injury of the people of this State.

"13th. That the said Virginia-Carolina Chemical Company in pursuance of the unlawful scheme and purpose for which its corporation was procured, and which it has pursued, in order that it might obtain, practically, complete control of the prices of fertilizers manufactured in the State of South Carolina, and practically to lessen or with a view to lessen full and free competition therein, entered into an unlawful and oppressive scheme to purchase the plants, property, good will and brands of the other defendants hereto, agreeing to pay therefor either in cash or in stock of the said Virginia-Carolina Chemical Company for the stock and property as aforesaid, or either or both of them of said other defendants; the method pursued by the said Virginia-Carolina Chemical Company being in some cases to acquire a controlling interest in the stock of the other defendants hereto, then electing its own officers or employees as officers of such corporations, and either conduct the ‧ business under an agreement or arrangement by which the said Virginia-Carolina Chemical Company controlled and dictated the prices of the products of such other companies until such time as the Virginia-Carolina Chemical Company should choose to direct conveyances of the property, plants, trade marks, brands and good will of such other companies, and in other cases direct at once such conveyances to it.

"That in pursuance of said unlawful scheme and purpose to acquire substantial control of the prices of fertilizers in this State and substantially lessen or with a view to lessen full and free competition against it in the manufacture and sale of fertilizers within the State, the said Virginia-Carolina Chemical Company caused to be conveyed to it the property of the several other defendants hereto, as follows:

"1st. On the 5th day of September, 1900, property and

plant of the Imperial Fertilizer Company in consideration of $225,000.

"2d. On the 5th day of September, 1900, the property and plant of the Standard Fertilizer Manufacturing Company in consideration of $300,000.

"3d. On the 19th day of November, 1898, the property, plant and good will of the Chicora Fertilizer Company in consideration of $400,000, and also the good will, brands, formulas, trade marks, signs, labels of said Chicora Fertilizer Company and used by it in connection with or acquired for the purposes of its business as aforesaid.

"4th. On the 20th day of August, 1898, the property and plant and good will of the Berkeley Chemical Company, in consideration, as set forth in said conveyance, of $37,325; on the same day said Berkeley Chemical Company conveying by its president, W. B. Chisolm, to the Virginia-Carolina Chemical Company several tracts of land among which is enumerated the works and property of the Stono Phosphate Company, together with brands and good will of the business carried on by said company, and further, on the same day the said Berkeley Chemical Company, by its president, W. B. Chisolm, conveyed to the Virginia-Carolina Chemical Company all the property of the Wappoo Mills and the franchises of the said Wappoo Mills, the aggregate consideration for the last two being $184,930.

"5th. That on the 9th day of August, 1899, the Greenville Fertilizer Company conveyed, in consideration of the sum of $130,000, to W. G. Crenshaw, Jr., Baltimore, Md., all the property, including brands, trade marks and the good will of the business of said company, and the said W. G. Crenshaw, Jr., on the 7th day of September, 1899, conveyed said property to the Virginia-Carolina Chemical Company, in consideration of the sum of $10 and other valuable consideration, together with all brands, trade marks and good will of the business of the Greenville Fertilizer Company.

"6th. That on the 15th of April, 1897, Louis H. Comstock, trustee, conveyed to the Virginia-Carolina Chemical

Company the property of the Carolina Sulphuric Acid Manufacturing Company, Blacksburg, Cherokee County, in consideration of $8,500, and the further consideration caused by an agreement signed March 26th, 1897, by Louis H. Comstock, trustee, and S. T. Morgan, president of the Virginia-Carolina Chemical Company.

"7th. That on the 21st day of September, 1899, the Columbia Phosphate Company conveyed to the Virginia-Carolina Chemical Company its entire plant, together with the good will, trade marks and brands, for the consideration of the sum of $85,000, to be paid by the said Virginia-Carolina Chemical Company to the said Columbia Phosphate Company in cash or in a like amount of the capital stock of the said Virginia-Carolina Chemical Company.

"14th. That in addition to the control and purchase by the said Virginia-Carolina Chemical Company of the stock and property or either or both of its codefendants herein, the said Virginia-Carolina Chemical Company, with a view to lessen the full and free competition in the manufacture and sale of fertilizers in this State, and to lessen full and free competition in the manufacture and sale of domestic raw material, the product of this State, and to advance, reduce or control the price thereof to the consumer thereof in this State has, as appears from State returns for assessment and taxation, acquired the stock or property or both of all the corporations engaged in this State in the manufacture and sale of fertilizers except four, whose output constitute but a very small percentage of the fertilizers manufactured and sold in South Carolina.

"15th. That in furtherance of its oppressive and unlawful scheme and combination to monopolize the business of manufacturing and selling fertilizers in South Carolina, the said Virginia-Carolina Chemical Company has acquired a very large proportion, as plaintiff is informed and believes, of the available supply of land phosphate territory in this State, either by purchase or lease, and controls the majority of the stock of the Southern Cotton Oil Company, a gigantic cor-

poration created under the laws of the State of New Jersey, and engaged in the manufacture of cotton seed into meal and other products, which said cotton meal is extensively employed as a fertilizer.

"16th. That in addition to the controlling interest of almost the entire fertilizer industry in this State, the said Virginia-Carolina Chemical Company, by reason of its enormous capital, as aforesaid, owns and controls, as plaintiff is informed and believes, a majority of the corporations engaged in the manufacture of fertilizers in the States of Georgia, North Carolina and Virginia, and has thus practically secured itself against competition from outside of the State of South Carolina in its control of fertilizers therein.

"17th. That to secure itself against future competition by the erection of factories in the State of South Carolina, for the manufacture and sale of fertilizers, the said Virginia-Carolina Chemical Company, its officers and stockholders, procured, to be executed by the directors and stockholders of the other defendants hereto, or some of them, agreements not to engage thereafter in the manufacture and sale of fertilizers for a greater or less period within the State of South Carolina, and the plaintiff is informed and believes and so charges, that such covenants and agreements were procured from and executed by the officers, directors and stockholders, or some of them, of the Imperial Fertilizer Company, the Standard Fertilizer Manufacturing Company, and the Chicora Fertilizer Company, defendants herein.

"That the several conveyances, sales and transfers of the stock and property, or either or both of them as aforesaid, and the covenants and agreements in restraint of trade as aforesaid, were made and entered into by its several codefendants with the knowledge that the said Virginia-Carolina Chemical Company was and is engaged in the unlawful and oppressive scheme to acquire control of the fertilizer industry in South Carolina, and were made and entered into with a view to lessen and tends to lessen full and free competition in the manufacture and sale of fertilizers the product of

domestic raw material of this State, and were designed to control the prices thereof to the consumers of such product in this State, and to lessen or affect full and free competition in the prices of fertilizers in this State, and to control said prices in this State.

"That said conveyances, sales and transfers as aforesaid, and said covenants and agreements in restraint of trade were made and entered into with the intent to evade the provision of the act of the General Assembly of South Carolina, approved the 25th day of February, A. D. 1897, and the amendment thereto, approved the 19th day of February, A. D. 1898, and are in violation of the public policy of the State of South Carolina, as declared in and by the said act, and the amendments thereto, and the said conveyances, sales and transfers, as aforesaid, and the said covenants and agreements, and either or all of them, are contrary to public policy, unlawful and void.

"Wherefore, plaintiff prays judgment:

"1st. That all and each of said unlawful conveyances, sales and transfers shall be delivered up and cancelled and declared to be void, and the said Virginia-Carolina Chemical Company be ordered to reconvey to its several codefendants herein the property conveyed and transferred to it as aforesaid, and that the said the other defendants hereto be directed to return to the Virginia-Carolina Chemical Company the consideration paid or agreed to be paid to each of them respectively, for the said conveyances and transfers, or the same be made a charge upon the property so decreed to be reconveyed.

"2d. That a receiver be appointed of the property of the defendants, the Imperial Fertilizer Company, Standard Fertilizer Manufacturing Company, Chicora Fertilizer Company, Berkeley Chemical Company, the Greenville Fertilizer Company, the Columbia Phosphate Company and the Carolina Sulphuric Acid Manufacturing Company, Blacksburg, Cherokee County.

"3d. That all agreements entered into by and between the Virginia-Carolina Chemical Company and the other defendants herein, or any of them, or with the directors of the other defendants herein, or stockholders, in restraint of trade, and in violation of the act of the General Assembly of South Carolina, as aforesaid, be set aside and declared null and void.

"4th. That the said Virginia-Carolina Chemical Company be adjudged and decreed to have violated the terms and conditions on which it was licensed to do business in this State, and that said license be adjudged and decreed to be forfeited, and the said Virginia-Carolina Chemical Company be enjoined from doing business in this State.

"5th. That the said Virginia-Carolina Chemical Company be adjudged and decreed to have forfeited its right to recognition as a corporation in the Courts of this State."

Thereafter, on 5th January, 1904, the following stipulation was entered into by the attorneys:

"It is hereby stipulated and agreed that the Virginia-Carolina Chemical Company will demur orally to the complaint herein, as not stating facts sufficient to constitute a cause of action, so that the argument upon such demurrer may test the constitutionality of the statute set up and relied on in said complaint and by said demurrer, and on the argument of the same, said demurrer shall not be construed to admit any intent as charged in the complaint further than as any such intent can be inferred by the Court from the substantive facts alleged and stated in said complaint."

In pursuance of this stipulation, a demurrer was filed on the grounds set out in the first three exceptions to the Circuit judgment.

The Circuit judgment on the demurrer is as follows:

"This is an action instituted by the Attorney General in the name of the State against the Virginia-Carolina Chemical Company, a corporation created under the laws of New Jersey, and seven other defendant corporations created under

the laws of South Carolina, charging a violation of the stat-
utes comonly known as the 'anti-trust laws,' approved the
25th day of February, 1897, and amended on the 19th day of
February, 1898, the first section of which reads as follows:

" 'Section 1. Be it enacted by the General Assembly of the
State of South Carolina, That from and after the passage of
this act, all arrangements, contracts, agreements, trusts or
combinations between two·or more persons as individuals,
firms or corporations, made with a view to lessen, or which
tend to lessen, full and free competition in the importation or
sale of articles imported into this State, or in the manufacture
or sale of articles of domestic growth or of domestic raw
material, and all arrangements, contracts, agreements, trusts
or combinations between persons or corporations, designed
or which tend to advance, reduce or control the price or the
cost to the producer or to the consumer of any such product
or article, and all arrangements, contracts, trusts, syndicates,
associations or combinations between two or more persons as
individuals, firms, corporations, syndicates or associations,
that may lessen or affect in any manner the full and free com-
petition in any tariff, rates, tolls, premiums or prices, or
seek to control in any way or manner such tariffs, rates, tolls,
premiums or prices in any branch of trade, business or com-
merce, are hereby declared to be against public policy, unlaw-
ful and void.'

"The complaint alleges that all the defendants except the
Virginia-Carolina Chemical Company were independently
engaged in the manufacture and sale of fertilizers in this
State, which product had become necessary to and was uni-
versally used by the farmers of the State in the production
of their crops, and that the Virginia-Carolina Chemical
Company, which filed its charter and amendments thereto
in the office of the secretary of State, on the 22d of January,
1900, with a capital stock of twenty-four million dollars.
'and plaintiff is informed and believes that the capital stock
has since been increased to fifty million dollars;' and (par.
13) 'entered into an unlawful and oppressive scheme to

purchase the plants, property, good will and brands of the other defendants hereto, agreeing to pay therefor in cash or in stock of the said Virginia-Carolina Chemical Company for the stock and property as aforesaid, or either or both of them of said other defendants; the method pursued by the said Virginia-Carolina Chemical Company being in some cases to acquire a controlling interest in the stock of the other defendants hereto, then electing its own officers or employees as officers of such corporations, and either conduct the business under an agreement or an arrangement by which the said Virginia-Carolina Chemical Company controlled and dictated the prices of the products of such other companies until such time as the Virginia-Carolina Chemical Company should choose to direct conveyance of the property, plants, trade marks, brands and good will of such other companies, and in other cases direct at once such conveyances to it.'

"The complaint alleges further that the said Virginia-Carolina Chemical Company, on the dates mentioned, caused to be conveyed to it the property of the several other defendants, and in the fourteenth paragraph, 'as appears from State returns for assessment and taxation, acquired the stock or property, or both, of all the corporations engaged in this State in the manufacture and sale of fertilizers, except four whose output constitutes but a very small percentage of the fertilizers manufactured and sold in South Carolina.'

"In paragraph 15, it is charged that 'the Virginia-Carolina Chemical Company has acquired a very large proportion, as plaintiff is informed and believes, of the available supply of land phosphate territory in this State, either by purchase or lease, and controls a majority of the stock of the Southern Cotton Oil Company, a gigantic corporation created under the laws of the State of New Jersey, and engaged in the manufacture of cotton seed into meal, which said cotton seed meal is entensively employed as a fertilizer.'

"In paragraph 16, it is alleged 'that in addition to the controlling interest of almost the entire fertilizer industry in this State, the said Virginia-Carolina Chemical Company, by

reason of its enormous capital as aforesaid, owns and controls, as plaintiff is informed and believes, a majority of the corporations engaged in the manufacture of fertilizers in the States of Georgia, North Carolina and Virginia, and has thus practically secured itself against competition from outside of the State of South Carolina in its control of fertilizers therein.'

"Paragraph 17 sets forth that 'the said Virginia-Carolina Chemical Company, its officers and stockholders, procured, to be executed by the directors and stockholders of the other defendants hereto, or some of them, agreements not to engage thereafter in the manufacture and sale of fertilizers for a greater or less period within the State of South Carolina, and the plaintiff is informed and believes, and so charges, that such covenants and agreements were procured from and executed by the officers, directors and stockholders, or some of them, of the Imperial Fertilizer Company, the Standard Fertilizer Manufacturing Company, and the Chicora Fertilizer Company, defendants herein;' and further alleges, 'that said covenants, sales and transfers, as aforesaid, and said covenants and agreements in restraint of trade, were made and entered into with the intent to evade the provision of the act of the General Assembly of South Carolina, approved the 25th day of February, A. D. 1897, and the amendments thereto, approved the 19th day of February, A. D. 1898, and are in violation of the public policy of the State of South Carolina, as declared in and by the said act, and the amendments thereto, and the said conveyances, sales and transfers, as aforesaid, and the said covenants and agreements, and either or all of them, are contrary to public policy, unlawful and void.'

"Under a stipulation that a demurrer should not be construed to admit any intent as charged in the complaint, further than as such intent can be inferred by the Court from the substantive facts alleged and stated in the complaint, the defendant interposed an oral demurrer to the complaint upon several constitutional grounds, alleging that the acts of the

General Assembly, above cited, under which this action was brought, are unconstitutional, and upon other grounds to be hereafter considered.

"One objection is that the above acts are in contravention of section 1, article XIV., in amendment of the Constitution of the United States, which enjoins any State from making or enforcing any law which shall abridge the privileges or immunities of citizens of the United States, directs that no State shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law. This constitutional objection cannot avail the defendant. It is well settled that the fourteenth amendment does not interfere with the exercise of the police power of a State.

"As was stated by our Supreme Court, in 42 S. C., 249, citing from 113 U. S., 27: 'In short, it is not to be doubted that the power to make ordinary regulations of police remains with the individual States, and cannot be assumed by the national government, and that in this respect it is not interfered with by the fourteenth amendment.' And it is likewise well settled that the police power can be invoked in defining, limiting, governing or destroying trusts, monopolies, combinations in restraint of trade, etc. The exact terms of the South Carolina act were passed upon by the Supreme Court of Tennessee (104 Tenn., 715), and declared constitutional as a police measure. Statutes of like nature and same purpose have been declared constitutional in the carefully considered cases of *Waters-Pierce Oil Co.* v. *State,* 19 Civ. App., 1; *State* v. *Buckeye Pipe Line Co.,* 61 Ohio St., 520; 152 Mo., 1, and see vol. 20, Am. & Eng. Encyc. Law, page 852. It is very obvious, therefore, that as the acts in question are police regulations, and that police regulations are not governed by the fourteenth amendment, and that no discrimination or class legislation is suggested, this ground of demurrer must be overruled.

"Another objection is that these acts are in contravention of the State and Federal Constitutions, enjoining that no

State shall pass any law impairing the obligations of a contract. The contention is that this State having invited and permitted the Virginia-Carolina Chemical Company, a New Jersey corporation, to do business in this State, and having accepted its New Jersey charter, that the terms of that charter must be respected as a contract assumed by this State.

"As already indicated, corporations are subject to the police power of the State. No suggestion is made that the State has attempted to surrender such power, for I presume it will not be seriously contended that the State could barter away such power, the same being an inherent right of sovereignty. Conceding that corporate charters are vested rights, it cannot be questioned that defendant corporation came into this State and could only come upon such terms as this State saw fit to impose. Now, one of the conditions imposed by chapter XLV. of the Revised Statutes of 1893, which permitted defendant to do business in this State, is contained in section 1471 of that chapter, providing every foreign corporation carrying on business or owning property in this State, shall be subject to laws as domestic corporations, and section 1499 (R. S., 1893), provides that *all* charters shall be subject to amendment. That is statutory reservation general throughout the country. It follows, then, that defendant being advised of these conditions, and accepting them, the statute laws of this State became a part of its charter, privileges and limitations, and cannot complain of the law it found in the statutes. This objection is overruled.

"The demurrer objects further that the acts in question are in violation of the Federal Constitution, which invests Congress with authority to regulate inter-state commerce, because section 1 of said act attempts to prevent 'contracts, etc. * * * between two or more persons as individuals, etc. * * * made with a view to lessen, or which tends to lessen, full and free competition in the importation or sale of articles imported into this State,' etc. It

strikes me that this clause is an attempt by the State to exercise a prerogative of Congress to regulate inter-state commerce. No act of Congress has invested the State with authority to interfere with this subject of commerce, and the police power cannot be invoked for that purpose. The State has no power over importations of articles of commerce. See recent case, *Smith* v. *LaFar,* 67 S. C., 491, 46 S. E., 332.

"To the extent of this clause the demurrer must be sustained. But it is contended by the Attorney General that the section contains other provisions which constitute a cause of action under this complaint. It is a rule, that a statute is not rendered unconstitutional by the presence therein of provisions which are unconstitutional when they can be eliminated without affecting the rest of the statute. I am satisfied, as the complaint herein has no reference to the violation of the importation clause, that a cause of action exists under the statute eliminated of its defective features, as above intimated. *State* v. *Potterfield,* 47 S. C., 75; *Supervisors* v. *Stanly,* 105 U. S., 305; *Powell* v. *State,* 69 Ala., 10. So far as defendant is concerned, the question is merely speculative. *Hill* v. *City Council,* 59 S. C., 415. This objection to the demurrer is overruled.

"Other constitutional objections are urged, but they merely involve the same terms and principles.

"Two other objections are offered, but as the section numbered 'third' is general in its terms, it cannot be considered, especially as all objections urged by counsel have been considered, or will be in the next and only remaining objection, which alleges that it nowhere appears upon the face of the complaint under the terms of said acts that any act of defendants has had the effect of lessening full and free competition in the manufacture or sale of articles of domestic growth, or domestic raw material, or has had the effect of having tended either to advance, reduce or control the price or cost to the producer or consumer of any such product or article, or has lessened or affected in any manner the rates,

tariffs, tolls, premiums or prices in any branch of trade, business or commerce.

"Under the rules of pleading a demurrer admits all facts well pleaded, and under the stipulation in this case, the substantive facts only can be considered. Now, the complaint alleges the following admitted substantive facts:

"That the Virginia-Carolina Chemical Company has had transferred to it all the other defendants corporations that were independently engaged in the manufacture and sale of fertilizers, and has acquired all other corporations engaged in the manufacture of fertilizers except four of small output; that the corporation has acquired a very large proportion, as plaintiff is informed and believes, of the land phosphate territory in this State, controls a majority of the stock of the Southern Cotton Oil Company, a manufacturer of a fertilizer ingredient; owns and controls a majority of the corporations engaged in the manufacture of fertilizers in the States of Georgia, North Carolina and Virginia, and has secured itself against competition from outside of this State of·its control of fertilizers therein; that covenants were entered into by the Virginia-Carolina Chemical Company, its officers and stockholders, with the other defendants, or some of them, *not to engage thereafter in the manufacture and sale of fertilizers for a greater or less period within the State of South Carolina.*

"From these admitted facts, the conclusion is irresistible, that the complaint states facts, which fall clearly within the purview of both the spirit and letter of the acts above cited, for, in the language of the act, the result of such a condition 'may lessen or affect in any manner the full and free competition in any tariff, rates, tolls, premiums and prices,' 'or which may tend to advance, reduce or control the price or the cost to the producer or consumer.'

"The intent of the combination cannot be considered whether such intent was to increase, reduce or control prices. The possibility of either falls within the meaning of the act.

"The demurrer is overruled."

The defendant, Virginia-Carolina Chemical Company, excepts to the judgment, upon the following grounds:

"That the presiding Judge should have sustained the demurrer herein, and held as conclusions of law:

"*First.* That the acts of the General Assembly of the State of South Carolina, referred to in article 10th of the complaint herein, to wit: The act passed by the General Assembly of South Carolina on the 29th day of February, 1897, and the act amendatory thereof, passed by the said Assembly of South Carolina on the 25th day of February, upon and to enforce the provisions of which this action is brought, are invalid, null and void, and inoperative under the Constitution and the laws of the United States, in that:

"(a) The said acts undertake, in contravention of section 8, of article I., of the Constitution of the United States, and the acts of Congress in pursuance thereof, to prohibit and render null and void all arrangements, contracts or agreements whatsoever, betwen persons, firms or corporations, which intentionally or unintentionally tend to lessen full and free competition in the importation or sale of articles imported into the State, or in the manufacture or sale of articles of domestic growth or of domestic raw material.

"(b) The said acts undertake, in contravention of section 1, of article XIV., in amendment of the Constitution of the United States, to prohibit and render invalid, null and void, all arrangements, contracts or agreements whatsoever between persons, firms or corporations, which intentionally or unintentionally tend to advance, reduce or control the price or cost to the producer or to the consumer of any articles imported into the State, or manufactured or grown therein.

"(c) The said acts undertake in contravention of section 8, of article I., of the Constitution of the United States, and the acts of Congress in pursuance thereof, and of section 1, article XIV., in amendment of said Constitution, to prohibit and render invalid, null and void all arrangements and contracts between persons, firms or corporations that may inten-

tionally or unintentionally lessen or affect in any manner full and free competition in any tariff, rates, tolls, premiums or prices in any branch of business, trade or commerce, or may seek to control the same.

"(d) The said acts undertake, in contravention of section 10, article I., of the Constitution of the United States, and of section 2, article IV., of said Constitution, to impair and destroy the rights, privileges and immunities agreed to be given and granted to foreign corporations by the public laws and statutes of the State of South Carolina in consideration of their locating, carrying on business or owning property therein.

"(e) The said acts undertake, in contravention of section 1, article XIV., in amendment of the Constitution of the United States, to deprive all corporations of their property without due process of law, and to deny to them the equal protection of the laws, and to abridge the privileges and immunities given and granted to foreign corporations by the public laws and statutes of the State of South Carolina, in consideration of their locating and carrying on business therein.

"(f) The said acts undertake, in contravention of sections 5 and 6, of article I., of the Constitution of the State of South Carolina, to abridge the rights, privileges and immunities of this defendant and deprive it of its property without due process of law, and impair the obligation of the contract entered into with this defendant, when it was invited to enter and locate and acquire property in the State of South Carolina by the public laws and statutes of said State, and deny to this defendant the equal protection of the laws.

"*Second.* That it nowhere appears upon the face of the said complaint, under the terms of the said act of 25th February, 1897, and amendatory act of 19th February, 1898, that any act or thing charged in the complaint as done by the defendants in this action or any of them has had the effect of lessening full and free competition in the importation or sale of articles imported into the State, or in the manufacture or

sale of articles imported into the State, or in the manufacture or sale of articles of domestic growth or domestic raw material, or has had the effect of having tended either to advance, reduce or control the price or cost to the producer or consumer of any such product or article, or has lessened or affected in any manner the rates, tariff, tolls, premiums or prices in any branch of trade, business or commerce.

"*Third.* That it nowhere appears upon the face of the said complaint that any act or thing charged in the complaint as done by the defendants in this action or any of them, is in violation of the act passed by the General Assembly of South Carolina, on the 25th day of February, 1897, and the act amendatory thereof, passed on the 19th day of February, 1898, which said acts are set forth in the complaint, or of any other provision of law.

"*Fourth.* That his Honor, the presiding Judge, erred in overruling the demurrer and in holding:

"(a) That the acts in question are police regulations, and as such were not governed by the fourteenth amendment; whereas, he should have held that the acts in question were not police regulations, and should further have held that no statute, whether by way of police regulation or otherwise, can be passed by any State in contravention of the direct terms of the fourteenth amendment.

"(b) That inasmuch as by statute law in this State the power is reserved to the State to alter and amend charters of corporations, therefore, the acts in question would be valid as having that effect only; whereas, he should have held that the acts in question were not amendments or modifications of any charter or privilege, but undertook in contravention of the provisions of the United States and State Constitutions to impose a penalty or punishment upon individuals and corporations for performing acts expressly authorized by law.

"(c) That the objection to the acts in question as in violation of the federal authority to regulate interstate commerce was untenable, because the complaint herein has no reference

to the violation of the importation clause, and so far as defendant is concerned, the question is merely speculative; whereas, he should have held that the validity of the act is to be determined by its language in its application to interstate commerce and not by the circumstances of the particular case at bar.

"(d) That from the admitted facts well pleaded in the complaint, the conclusion was irresistible that the complaint states facts which fall clearly within the purview of both the spirit and letter of the acts in question; whereas, he should have held that from the complaint taken in connection with the stipulation, the facts which appeared and which alone could be considered by the Court, were all acts which were authorized by law, and that no unlawful intent can be inferred by the Court from the mere performance of a series of lawful acts which are not alleged to have eventuated in any unlawful result, nor can a crime be committed by, or punishment be inflicted for, the performance of a lawful act, no matter what was the motive or result of its performance."

*Messrs. Mitchell & Smith, James Simons* and *W. A. Holman, for appellants,* cite: *Act made criminal is left uncertain:* 2 Pollock & Maitland's Hist. of Eng. L., 473; 4 Black. Com., 473; 8 Ency., 2 ed., 285; 7 Humph., 150; 52 Ala., 309; 4 Dev., 410; 91 N. C., 550; 39 N. J. L., 38; End. on Inten. of Stat., sec. 24; 2 Or., 238; 41 Tex. Crim., 59; 11 Wash., 423; 54 S. C., 196. *Statute violates fundamental rights of contract:* 2 Eddy Law of Con., 1012; 1 Bay, 93, 252; 2 Pet., 657; 111 U. S., 762; 165 U. S., 589; 74 N. Y., 509; 98 N. Y., 98; 99 N. Y., 377; 109 N. Y., 389; 136 N. Y., 577; 162 N. Y., 89; 113 Pa. St., 431; 45 N. E. R., 313; 160 Ill., 459; 155 Ill., 98; 70 Mich., 534; 77 Mich., 199; 115 Mo., 307; 129 Mo., 163; 33 W. Va., 179; 85 Cal., 274; 155 Mass., 177. *Not an exercise of police power:* 22 Ency., 936; 109 N. Y., 389; 153 N. Y., 188; 184 U. S., 558; 94 U. S., 267; 104 U. S., 540. *An unconstitutional condition is void:* 178 U. S., 397; 180 U. S., 452; 183 U. S., 24; 191

U. S., 288; 96 U. S., 535; 121 U. S., 186; 172 U. S., 239; 121 U. S., 186; 146 U. S., 202; 170 U. S., 111. *Statute deprives corporations of their property without due process:* 118 U. S., 39; 164 U. S., 578; 169 U. S., 410; 172 U. S., 239. *If passed as a police measure, the statute must apply to individuals as well as corporations:* Tiedeman Lim. of Pol. Pow., sec. 1; 171 U. S., 567. *No illegal act was performed by appellant in contracting with others not to engage in same business:* 24 Ency., 841; 30 S. C., 412.

*Attorney General U. X. Gunter, Jr.,* contra, cites: *Sec. 1., art. XIV., in amendment to Con. of U. S., does not effect police power of State:* 5 Strob., 3, 161; 38 S. C., 64; 42 S. C., 222, 249; 113 U. S., 27; 172 U. S., 565; 152 Mo., 1; 168 N. Y., 89; 61 Ohio St., 520; 104 Tenn., 715; 88 Tex., 184; 19 Tex. Civ. App., 1; 165 U. S., 23; 142 U. S., 387; 115 U. S., 519; 113 U. S., 31; 128 U. S., 582; 20 Ency., 852; 177 U. S., 42. *The Con. provision as to abridging privileges of citizens does not prohibit legitimate use of police power:* 16 Wall., 76; 127 U. S., 209; 18 How., 591; 11 Blatchf., 200; 48 Cal., 203; 8 Wall., 168. *The act does not contravene the Con. inhibition against passing a law impairing the obligations of contracts:* 24 S. C., 60; 38 S. C., 103. *Unconstitutional provision in statute may be eliminated if it does not affect remainder:* 47 S. C., 75; 105 U. S., 305; 69 Ala., 10; 103 U. S., 118; 100 U. S., 82; 95 U. S., 377. *The statute is directed at the possible effect of acts, not the probable or intended effect:* 166 U. S., 290; 156 U. S., 1, 342; 152 Mo., 1.

May 22, 1905. The opinion of the Court was delivered by

MR. JUSTICE GARY. This is an appeal from an order overruling a demurrer to the complaint, on the ground that it does not state facts sufficient to constitute a cause of action, in the particulars mentioned in the first, second and third exceptions, which, together with the other exceptions, the

complaint, and the order of his Honor, the Circuit Judge, will be set out in the report of the case. The first question that will be considered is the construction of the statute of this State prohibiting certain trusts and combinations.

In the case of *Northern Securities Co.* v. *United States,* 24 Sup. Ct. Rep., 436, 454, 466, 193 U. S., 197, the Court had under consideration the act of Congress entitled: "An act to protect trade and commerce against unlawful restraints and monopolies," which provides that "every contract combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, among the several States, or with foreign nations, is hereby declared to be illegal." * * * Mr. Justice Harlan, who wrote the opinion of the Court, in which three other members concurred generally, and Mr. Justice Brewer in a separate opinion, announced the proposition: "That the act is not limited to restraints of interstate and international trade or commerce that are unreasonable in their nature, but embraces *all* direct *restraints* imposed by any combination, conspiracy or monopoly upon such trade or commerce."

Mr. Justice Brewer did not accept this proposition, except in so far as it was applicable to unreasonable restraints imposed upon trade or commerce, but, in speaking of former decisions of the Court, said: "Instead of holding that the anti-trust act includes all contracts, reasonable or unreasonable, in restraint of interstate trade, the ruling should have been that the contracts there presented were unreasonable restraints of interstate trade, and as such within the scope of the act. That act, as appears from its title, was leveled at only 'unlawful restraints and monopolies.' Congress did not intend to reach and destroy those minor contracts in partial restraint of trade, which the long course of decisions at common law had affirmed were reasonable and ought to be upheld. The purpose was rather to place a statutory prohibition, with prescribed penalties and remedies, upon those contracts which were in direct restraint of trade, unreasonable and against public policy."

The opinion of Mr. Justice Harlan to the extent of Mr. Justice Brewer's concurrence, correctly stated the principles governing the construction of the act then under consideration. That principle is applicable to the statute of this State, and it must be construed as intending that the contracts, &c., herein mentioned, were unlawful and against public policy only when made with a view to lessen or which tend to lessen full and free competition to an unreasonable extent.

The admitted substantive facts set forth in the decree of his Honor, the Circuit Judge, show beyond doubt that they lessened, or tended to lessen, full and free competition to an unreasonable degree. This was a natural consequence that might reasonably have been expected to result from them. Therefore, it must be presumed that such result was intended. 22 Enc. of Law, 1235.

What, then, was the effect of this intention upon the transactions set out in the complaint? In the case of *Swift & Co.* v. *United States,* 25 Sup. Ct. Rep., 276, 279, the principle is thus stated: "The scheme as a whole seems to us to be within the reach of the law. The constituent elements, as we have stated them, are enough to give the scheme a body, and for all we can say, to accomplish it. Moreover, whatever we may think of them separately, when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme. It is suggested that the several acts charged are lawful, and that intent can make no difference. But they are bound together as the parts of a single plan. *The plan may make the parts unlawful. Aikens* v. *Wisconsin,* 195 U. S., 194, 206, *ante,* p. 3, Sup. Ct. Rep., 3. The statute gives this proceeding against combinations in restraint of commerce among the States and against attempts to monopolize the same. Intent is almost essential to such a combination, and is essential to such an attempt. Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass; an intent to bring it to pass is

necessary in order to produce a dangerous probability that it
will happen.    *Com.* v. *Peaslee,* 177 Mass., 267, 272, 59 N.
E., 55.    *But when that intent and the consequent dangerous
probability exist, this statute, like many others, and like the
common law in some cases, directs itself against that danger-
ous probability as well as against the completed result"*
(italics ours).    In *Aikens* v. *Wisconsin,* 25 Sup. Ct. Rep., 3,
it is said: "No conduct has such an absolute privilege as to
justify all possible schemes, of which it may be a part.    The
most innocent and constitutionally protected of acts or omis-
sions, may be made a step in a criminal plot, and if it is a step
in a plot, neither its innocence nor the Constitution is suffi-
cient to prevent the punishment of the plot by law."    See,
also, the *National Cotton Oil Co.* v. *State of Texas,* 25 Sup.
St. Rep., 379, and *Gwynn* v. *Citizens Tel. Co.,* 69 S. C., 434.
In 15 Enc. of Law, 934, it is said: "Where a contract belongs
to a class which is reprobated by public policy, it will be
declared illegal, though in that particular instance no actual
injury may have resulted to the public, as the test is the evil
tendency of the contract, and not its actual results."

The principles just stated show that the different acts
alleged in the complaint, in combination with the intent to
effect the result of lessening or tending to lessen full and
free competition in an unreasonable manner, were unlawful
and against the public policy of this State.

Upon all other questions in the case, this Court concurs
in the rulings of his Honor, the Circuit Judge, for the
reasons stated in his order.

It is the judgment of this Court, that the judgment of the
Circuit Court be affirmed.

JUDGE D. A. TOWNSEND *sat in place of* MR. JUSTICE
WOODS, *disqualified.*