### 7663

### RHODES v. GRANBY COTTON MILLS.

1. EXCEPTION based on objection to evidence not stating the ground is too general.

2. EVIDENCE.—There being evidence tending to show a list of strikers was furnished by the defendant mill to other mills, the plaintiff could testify he was refused employment at other mills by reason of his being so listed by the defendant mill.

3. APPEAL.—Error in the admission of evidence not shown to be prejudicial to appellant will not be considered.

4. AN EXCEPTION not pointing out the specific ruling which appellant seeks to have reviewed is too general.

5. EVIDENCE—PAPERS PRODUCED ON NOTICE.—Where several papers pinned together are produced by one party on notice to produce one, the party requesting may separate them and introduce the one noticed to be produced, if they are not one and the same, the privilege remaining with the other side to introduce the others.

6. IBID.—APPEAL.—Where party does not at time of production on notice object to introduction of paper on ground that it is confidential, he cannot afterwards make that objection.

7. CHARGE.—Calling attention to the gravity of the issues in a case is not a charge on the facts.

8. MASTER AND SERVANT—COMBINATIONS—CONSPIRACY.—A combination or agreement among masters to furnish to each other the names of striking or undesirable servants is not unlawful, but where a master with knowledge that a servant was not a striker puts his name on a list of strikers or with such knowledge refuses to take the name from such list, he is liable to the servant for actual and punitive damages suffered on account of such blacklisting. *Here* the evidence is held sufficient to warrant the finding that the master refused to take the name of the servant off the blacklist after knowledge that he was not a striker.

Before MEMMINGER, J., Richland, December, 1909. Affirmed.

Action by Olin M. Rhodes against Granby Cotton Mills. From judgment for plaintiff, defendant appeals on the following exceptions:

1. "Because counsel for defendant, having previously objected to testimony along the line, his Honor, against the objection of defendant, allowed the witness, J. C. Kirby, to testify as follows, to wit: Mr. Edmunds: Q. Who furnished you the list? A. Mr. Wallace, superintendent of the mill at that time (meaning the Columbia Mills). The Court: It will be relevant to show that he refused him employment on account of having received that list, if you can show the Granby Cotton Mills is connected with it. Mr. Edmunds: We expect to connect it. The Court: If you do not connect it, it will be stricken out. Mr. Edmunds: Q. Was it as a result of the strike at the Granby Mills, and your receiving that list, that employment was refused? Mr. Shand: We object to that. The Court: State whether or not. Mr. Edmunds: State whether or not the strike at the Granby Mills and his name being on that list, that employment was declined him? A. Yes, sir. It being error to allow such witness to testify that he was refused employment in said Columbia Mills because of a strike at the Granby Mills and because plaintiff's name was on an alleged list of strikers at the Granby Mills, when there was no testimony showing that such list of strikers had been furnished by the Granby Mills.

2. "Because his Honor, the presiding Judge, did not, upon motion of defendant's counsel at the close of the testimony for the plaintiff, strike out the testimony of the witness, J. C. Kirby, there having been up to that time no testimony showing any connection between the Granby Cotton Mills and the list testified to by the said J. C. Kirby.

3. "Because his Honor erred in allowing the witness, C. S. Green, against the objection of the defendant, to testify to a tacit courtesy recognized by the Columbia Mills in 1900 with reference to the giving of information upon the request of the superintendents of other mills, without connecting the defendant with it then and without showing that such a tacit courtesy existed in 1907.

4. "Because his Honor did not, upon the motion of the defendant's counsel at the close of plaintiff's testimony, strike out the testimony of the witness, C. S. Green, as to any tacit understanding or tacit courtesy practiced by the superintendent of the Columbia Mills, when there had been no testimony to connect the defendant, or its superintendents, with such tacit courtesy or understanding, and there had been no testimony to show that such tacit courtesy or understanding existed in 1907.

5. "Because, against the objection of the defendant, his Honor allowed the witness, C. S. Green, to testify that the Columbia Mills, or the said C. S. Green, would make use of such tacit understanding or courtesy to which the said witness had testified, when it had not been shown that the defendant company was in anywise a party to such tacit understanding or courtesy.

6. "Because his Honor erred in committing the plaintiff, against the objection of defendant, to testify that he sent messages to mills in other States and received no response thereto, without testimony to show that the messages so sent were ever received or that a failure to receive a favorable response was in anywise due to any act or communication of the defendant.

7. "Because his Honor erred, while the plaintiff was on the stand as a witness, in ruling as follows: 'I rather think, the Court is satisfied, that there is some evidence *prima facie* of conspiracy between these mills to prevent these people getting work and sending around lists making it impossible for them to get work, that there is some *prima facie* evi-

dence showing combination and conspiracy between them,' when, *first,* there was no *prima facie* evidence of agreement or combination between any mill for any purpose touching the subject matter of this action; and, *secondly,* even if there was *prima facie* evidence of some combination or agreement between some mills, the defendant, Granby Mills, had not been connected with it; and, *thirdly,* even if there was some *prima facie* evidence to show a combination or agreement between certain mills to do some act in connection with the subject matter of this suit, it was not to do any unlawful act by unlawful means; and, *fourth,* even if there were some evidence as to a combination between certain mills to do an unlawful act, the defendant, Granby Mills, had not been connected with it.

8. "Because, under the erroneous ruling complained of in Exception 7, his Honor erred in admitting, against the objection of the defendant, the testimony of plaintiff, and thereafter of witnesses L. E. Rhodes, Dozier Rhodes and A. L. Knight as to declarations as to defendant's acts and statements made to them; or in their hearing, by persons in nowise connected with the defendant.

9. "Because his Honor erred in ruling: 'The combination having been testified to, being established to some extent, the declaration of parties connected with and in furtherance of that combination are admissible;' when no such combination had been to any extent established or testified to, and in pursuance of such ruling in admitting as testimony the declarations of Wallace and others who were in nowise connected with the defendant, and which declarations were in nowise binding on defendant.

10. "Because his Honor erred in permitting the witness Knight, to testify, against the objection of the defendant, as to the contents of a list seen by him at the Palmetto Cotton Mills, when there was not sufficient proof to show that said list was made by the defendant or authorized by it.

11. "Because his Honor erred, as matter of law, in permitting the witness, Knight, to testify, against the objection of the defendant, as to the contents of a list alleged to have been seen by him at the Palmetto Cotton Mills, when no sufficient proof had been made of the loss of the original according to the rules of law.

12. "Because his Honor erred in holding sufficient proof to have been made of the loss of the original of the letter referred to in the preceding exception, and in admitting secondary evidence of its contents as upon sufficient proof when the last custodian, the former superintendent Bagwell, had not been examined as to his disposition of the letter, and the facts failed to show that a *bona fide* and diligent search had been unsuccessfully made for the original in the place where it was most likely to be found, and thus all sources of information and means of discovery had not been exhausted in a reasonable degree.

13. "Because the defendant, upon notice to produce served by the plaintiff, having produced in Court an original list of strikers, written in ink and indelible pencil, which had never been out of the possession of the defendant or exhibited to anyone else until so produced, and also having produced in Court a document which consisted of a typewritten letter, a typewritten list and a printed slip, all three fastened together as one document, stating expressly the terms of the production, namely, stating that 'this is the only letter we have in our possession containing a copy of that list, with such additional names as were given to the president, etc.,' his Honor erred in permitting such typewritten list to be used as a list furnished by defendant on demand, without submitting the letter and printed exhibit at the same time, when there was nothing else than such production by the defendant to show that such typewritten list had been sent out by defendant.

14. "Because his Honor erred in ruling that a part of a letter might be introduced in evidence by plaintiff with the

privilege to defendant of introducing the other parts and in permitting the plaintiff so to introduce said list, detached from the entire letter; whereas, the letter having been produced as a whole and the list only as part of it, all the parts were admissible in evidence as a whole, or none of them.

15. "Because, the production having been made simply as a letter in the possession of the defendant, containing a list, etc., without any statement on the part of counsel as to the nature of the letter or the character of the reference in the letter to the list, and more particularly without any statement on the part of counsel that the said list had been *sent out*—his Honor erred in permitting a part of the said letter to be introduced in evidence by plaintiff *as a list which had been sent out by defendant,* when there was no evidence that such part had been sent out by the defendant or that it had been sent out as a list of strikers, or that it had come from the defendant at all, except as might be explained by the letter.

16. "Because his Honor erred in not granting, upon motion of the defendant, a nonsuit, because (a) There was no competent testimony of any conspiracy, agreement or combination between the defendant and any other mills as to nonemployment of strikers at other mills, or as to any other unlawful act, or lawful act to be accomplished by unlawful means; (b) the communication of the names of strikers to other mills, if legally proved, was a confidential communication and gave to plaintiff no cause of action; (c) it was an entire failure to prove the material allegations of the complaint of a wrongful act by the defendant.

17. "Because his Honor erred in the opening general remarks of his charge in conveying to the jury his impression that the defendant had done wrong to the plaintiff and that such wrong was of a grave nature, thereby expressing his opinion on the facts, in violation of the provisions of the Constitution.

18. "Because, the case being one between employer and employee, between a corporation and a laborer, the issue being an alleged unlawful combination between corporations to prevent the defendant from pursuing the labor of his hands, and testimony having been introduced for the plaintiff in the effort to show that he was driven from his home into enforced exile, his Honor erred in addressing to the jury the opening remarks of his charge, the said remarks having the effect of applying the statements of Holy Writ to the facts of this case, and so applying them, both in the substance of the quotations and the manner of their introduction, as to inflame the prejudices of the jury and to play upon their sympathies, thus tending naturally to prejudice the defendant in the minds of the jury and to lead to a capricious verdict without regard to the facts of the case.

19. "Because his Honor violated the provisions of the Constitution in charging that upon the issue raised by the pleadings in this case 'it appears to me to be one of the most serious and far-reaching in the principle involved of any which has come under my observation', thereby indicating, punitive damages being involved, that the charge was of a serious nature, and indicating his opinion to the jury.

20. "Because his Honor erred in refusing defendant's request to charge numbered V (11), which was as follows: 'That if defendant, a cotton mill corporation, was reflected upon for its conduct in the matter of a strike, in a published article in a newspaper, with the names of those who helped to break the strike, also published a reply by said corporation defending its course and giving the names of those concerned in the strike, sent only to other cotton mill corporations, engaged in the same line of business, is a privileged communication and in itself furnishes no cause of action for resultant cause or damage to those whose names are properly on such list,' it being a correct proposition of law, not a charge on the facts, and asked of him a contsruction of a written document.

21. "Because his Honor erred in refusing, upon request of the defendant, to charge that the jury could not find punitive damages in this case.                                   .

22. "Because his Honor erred in refusing, upon request of defendant, to charge that the jury must find a verdict for defendant.

23. "Because his Honor erred in refusing defendant's motion for a new trial, he having charged that plaintiff could not recover unless plaintiff established 'a combination, or conspiracy, or agreement among these mills to which the Granby Mills was a party,' and there being no legal evidence to sustain such allegation of the complaint.

24. "Because, his Honor having charged, in effect, that plaintiff could not recover unless he established a conspiracy between these mills to which the Granby Mills was a party, a conspiracy being an agreement to do an unlawful thing or a lawful thing by unlawful means, there was no competent evidence of such agreement between Granby Mills and any other mill, and his Honor erred in refusing a new trial on this ground.                                        -

25. "Because his Honor erred in charging the jury as follows : 'If it (that is, the act of the defendant) was merely a wrong on their part, you could only give him actual damages, such actual damages as he may have sustained by reason of the violation of his legal right to get work, but if you find that there was (a) willful, wanton, malicious conduct on their part * * * why, you go into the question of punitive damages also ;' again, after charging plaintiff's fifth request : 'If the act was merely wrongful, only actual damages can be recovered; if willful or malicious, punitive damages ;' the error being, that such charge ignores the *quasi* privilege of a communication between those engaged in the same business, and ignores the justification of honest mistake and reasonable grounds for belief, even where the publication was in fact wrong.

26. "Because his Honor confuses in his charge throughout conspiracy—that is, an agreement to do an unlawful act or a lawful act by unlawful means—with mere agreement or combination to an act which may become unlawful when done beyond and outside of the scope of agreement.

27. "Because the uncontradicted testimony of the witnesses, Parker, Beaty, Black, Duncan, Praddy and Wallace, that there was no such agreement or combination as was charged in the complaint was not overcome by the statement of the witness Green, that as a matter of courtesy, existing several years before, information would be given to an inquiring mill superintendent of the reasons why an applying employee had been discharged by the mill of whom such inquiry was made, and there being no other legal testimony on this point.

28. "Because his Honor, in his order refusing a new trial, erred in stating that the list referred to in defendant's thirteenth ground for a new trial 'was not one and the same paper as the others which defendant had attached to it, but was the list which plaintiff referred to in his complaint;' and upon such misapprehension, clearly shown by the record, he erred in refusing a new trial."

*Messrs. Shand & Shand, Lyles & Lyles* and *W. H. Parker,* for appellant.

*Messrs. Shand & Shand* cite: *Verdict is based on finding of conspiracy:* 16 S. C., 14; 68 S. C., 526. *Papers produced should have been admitted as one instrument:* 2 Rich., 518; 9 S. C., 454; 73 N. C., 67; 38 Cal., 278; 2 Penn. St., 331; 39 La. Ann., 1089; 6 S. & R., 425; 2 A. J. Marsh., 685. *Privileged communications:* 5 E. & B., 348; 10 L. R. A.,66; 75 N. E., 877; 25 Cyc., 395; 15 A. R., 794; 109 Mass., 193.

*Messrs. Lyles & Lyles* cite: *Defendant has the right to enter into an agreement with others not to employ certain*

*help:* 49 Am. R., 666; 55 L. R. A., 271; 62 L. R. A., 931; 48 S. E., 177; 124 Fed., 246; 55 Atl., 1014; 38 L. R. A., 505; 77 Fed., 954; 63 L. R. A., 289, and note; note in 4 L. R. A. N. S. *No liability in absence of proof of willfulness:* 81 S. C., 31; 69 S. C., 331; 68 S. C., 98. *Declarations and acts of third person not connected with defendant not admissible:* 26 S. C., 235; 1 Green Ev., sec. 98-126; 16 Cyc., 1192-5; 5 McL. U. S., 513; 3 Green. on Ev., sec. 94; 8 Cyc., 680; 11 S. C., 195; 34 S. C., 41, 49; 25 Mich., 120; 62 L. R. A., 922. *Contents of a writing should not be admitted by parol until loss of original is sufficiently proved:* 17 Cyc., 546; 5 Rich., 373; 9 Rich., 371; 37 S. C., 299; 55 S. C., 277.

*Mr. W. H. Parker* cites: *Declarations of coconspirators:* Wig. on Ev., sec. 1077, 1079; 6 Ency., 867-8; 49 S. C., 422; 4 Strob., 266; 80 Am. Dec., 545; 6 Ency., 869. *Introduction of part of papers produced on notice:* 1 Green. Par., 201; 3 Wig. Ev., sec. 2102; 2 Rich., 518; 9 S. C., 459; 15 S. C., 268; 38 Cal., 278. *Secondary evidence of writing not admissible without proper proof of loss:* 1 Green. Ev., 563; 11 Rich., 6; 37 S. C., 285; 2 Mills Con. R., 342; 47 S. C., 503.

*Messrs. Logan and Edmunds,* contra, cite: *Right of individuals to enjoy labor:* Add. on Torts, sec. 22; 165 U. S., 589; 111 U. S., 762; 195 U. S., 205; 63 L. R. A., 289; 62 L. R. A., 717; 39 L. R. A., 612; 127 U. S., 684. *Proof of conspiracy:* 1 Green. Ev., secs. 93, 94, 111. *After completion of conspiracy declarations of one conspirator are not binding on the other:* 14 S. C., 628; 34 S. C., 41; 40 S. C., 328, 481; 49 S. C., 418; 49 L. R. A., 612. *Proof of loss to admit secondary evidence is for Judge:* 37 S. C., 102. *How loss shown:* 55 S. C., 277; 78 S. C., 76. *Introducing part of papers produced:* 53 S. C., 361; 58 S. C., 253; 52 S. C., 16; 60 S. C., 19; 36 S. C., 368. *Inflaming minds of jurors by*

*charge:* 79 S. C. 372.    *Request as to privileged communications on the facts:* 58 S. C., 230; 49 L. R. A., 616.

September 1, 1910.  The opinion of the Court was delivered by

MR. JUSTICE GARY.  This is an action for damages alleged to have been sustained by the plaintiff, as the result of a conspiracy between the defendant and other like corporations, whereby a number of such mills, refused to give employment to the plaintiff, after being notified by the defendant, that it had blacklisted him.

The answer to the complaint was a general denial.

The jury rendered a verdict in favor of the plaintiff, for two thousand dollars actual, and eight thousand dollars, punitive damages.

The defendant's attorneys made a motion for a new trial, and his Honor, the presiding Judge, ordered that it be granted, unless the plaintiff remitted upon the record, three thousand dollars of the amount awarded for punitive damages, which was done, and the defendant appealed upon exceptions, which will be set out in the report of the case.

We proceed to the consideration of the exceptions.

*First Exception.*  The objection to the testimony was too general, as it failed to specify the ground thereof.  *Norris* v. *Clinkscales,* 59 S. C., 232.  It would be unjust to the plaintiff, as well as to the presiding Judge, to consider the ground of error assigned by the exception, when the presiding Judge was not requested to rule thereon. There is, however, another reason, why the exception must be overruled.  The following statement appears in the record:  "Before any witness was sworn, Mr. Edmunds, plaintiff's attorney, inquired of defendant's attorney, what response they would make to their notice to produce.  Mr. Shand, defendant's attorney, produced and handed to Mr. Edmunds a paper, which he said was the original list of strikers, and had never been out of

the possession of defendant, until this moment. This paper is the one hereinafter printed, as the paper introduced in testimony numbered 1. Mr. Shand, also, at the same time, produced and handed to Mr. Edmunds, the three papers attached together by a pin, which were afterwards taken apart by plaintiff's attorneys, and the one below numbered 3 of the documentary testimony, was offered in evidence by plaintiff's attorneys, and the two hereinafter referred to, in documentary evidence numbered 5, were offered in evidence by the defendant."

J. H. M. Beaty, a witness for the defendant, thus testified: "When this strike took place, do you know whether or not a list of the strikers was furnished other mills? A. I didn't personally. Just whether you know it? Well, I know it was done, but I was going to say, I didn't see it done, and a copy of it was not furnished me, but I know it was done. Did you see any of those lists? I afterwards did, yes. Whereabout, Mr. Beaty? I had to get a copy of what was sent out, from Mr. Parker in Greenville. The original list that he used, of course, was made up at the mill. The original list was sent out from Greenville? Sent out from Columbia. Mr. Parker was in Columbia at that time."

Mr. Lewis W. Parker, president of the Granby Mills, testified as follows: "Mr. Shand: Now, here is the typewritten list of the weavers containing a good many names, and among others is O. M. Rhodes, L. E. Rhodes, Hoyt Rhodes, Harley Rhodes, and Sally Rhodes, and about a dozen or so of loom fixers. We offer that in evidence. You sent that to the Palmetto Mills, to the manager of the mills, and to some others? Some other mills in the State. I sent none outside of the State, but to a certain number of mills in the State where my personal relations were pleasant. * * * Were the ones you sent out all alike? Exactly alike, manifold copies; the lists were manifolded, and this is one of the manifold copies, and the list of strikers so

attached to the letter, was the manifold list. If all were in the courthouse they, would look like that and read that way? Yes, sir. * * * Where did you get the list that you attach to the letter? That list was furnished me by the office at the Granby Mills. On your demand? On my request."

Thus showing that the list of strikers was furnished by the Granby Mills.

*Second Exception.* The testimony just set out shows such connection.

*Third, Fourth and Fifth Exceptions.* Even conceding that there was error, it has not been made to appear, that it was prejudicial, to the rights of the appellant.

*Sixth Exception.* The statement and the testimony reproduced, in considering the first exception, show that the question presented by this exception, is without merit.

*Seventh Exception.* The error assigned by this exception, will be determined, when the Court comes to consider the exceptions, assigning error in refusing to direct a verdict, and grant a new trial on a similar ground.

*Eighth Exception.* This exception fails to point out the specific ruling, which the appellant seeks to bring in review, and is, therefore, too general for consideration.

*Ninth Exception.* Previous rulings on other exceptions dispose of this question.

*Tenth, Eleventh and Twelfth Exceptions.* What was said, in considering the first exception, shows that even if erroneous, these rulings were not prejudicial.

*Thirteenth and Fourteenth Exceptions.* The following ruling of the presiding Judge shows that this exception can not be sustained: "As to the ground which seeks to charge error in admitting the list in evidence, and not requiring plaintiff at the same time to introduce and read to the jury other papers, which had been attached to the list, in response to plaintiff's notice to pro-

duce said list, the report of the case will show, that the list was not one and the same paper as the others, which defendant had attached to it, but was the list which the plaintiff referred to in his complaint. He did not consider the other attached matter relevant to prove his case. I gave defendant permission to introduce said other papers whenever he saw fit, and as a matter of fact, when introduced, they furnished most effective evidence for plaintiff, and were constantly read and referred to in his behalf, and sought to be explained away on behalf of defendant in the arguments."

*Fifteenth Exception.* What has already been said disposes of this exception.

*Sixteenth Exception.* When the defendant produced the list of strikers, it did not object to its introduction, on the ground that its communication to other mills was confidential. So that, even if it could be regarded as a privileged communication, the exception cannot be sustained. The other assignments of error, mentioned in this exception, will be determined, when the Court shall consider whether, there was error in refusing to direct a verdict or grant a new trial, on the ground that there was no testimony tending to prove a conspiracy.

*Seventeenth and Eighteenth Exceptions.* These exceptions are too general for consideration, but, waiving such objection, they cannot be sustained, as the appellant has failed to satisfy this Court, that such rulings were prejudicial.

*Nineteenth Exception.* It is not reversible error, for the presiding Judge merely to call to the attention of the jury the gravity of the issues involved.

*Twentieth Exception.* What was said, in considering the sixteenth exception, shows that this exception must be overruled.

The consideration of the *twenty-first* and *twenty-fifth* exceptions will be postponed, until it is determined whether there was any evidence of a conspiracy.

*Twenty-eight Exception.* What has already been said shows that this exception cannot be sustained.

We next come to the consideration of the *seventh, sixteenth, twenty-second, twenty-third, twenty-fourth, twenty-sixth* and *twenty-seventh exceptions,* which, in the language of appellant's attorneys, raise the question, whether there was "error in holding, that there was some evidence of a combination, conspiracy or prior agreement, between the defendant and other cotton mills, and in failing, because of such erroneous rulings, to grant a nonsuit, direct a verdict, and grant a new trial."

J. C. Kirby, an overseer of weaving in the Columbia Mills, thus testified, as a witness for the plaintiff: "Do you remember whether or not the name of Olin M. Rhodes was on that list? As well as I remember, it was. Did he apply to you for employment? Yes, sir. Was it given to him? No, sir. * * *

"Mr. Edmunds: State whether or not the strike at Granby Mills, and his name being on that list, that employment was declined him? Yes, sir. * * * What was your objection to taking him? The objection was with me; in the first place, Mr. Wallace instructed me not to employ anyone of the strikers. * * * You had need for labor in the mill at that time? I do not remember, we generally do. You cannot say whether you would have employed him or not, if he had not been reported as striker? I rather think I would have. If he had come and told you he had struck at Granby, and wanted employment in your mill, would you have employed him? No, sir. When was that, that he applied to you; how long after the strike at Granby? Probably two or three days; I can't tell you. Did he tell you he had not struck? Yes, sir. He said so? Yes, sir. Did he tell you his family had not struck? No, sir; he told me two of his family had struck, as well as I remember. But that he had not? Yes, sir. And

the other two had not? I think that is the way it was, as near as I can remember now."

C. S. Green, an employee of the Columbia Mills, testified as a witness for the plaintiff, as follows: "Do you know as a fact, whether or not there is any agreement or understanding, written or verbal, between the various mills about the employment of labor, help, leaving one mill and going to another? * * * If there is any verbal understanding, please state it? There is a tacit understanding, commonly known as mill courtesy, whereby one superintendent has information from the other superintendent, as to help leaving one mill, and seeking employment in another mill.

"Mr. Edmunds: Is that agreement and understanding, tacit understanding, does that exist with your mill and the Granby Mill, and other mills here? It is entirely within the jurisdiction of the superintendent. But as a matter of fact, do you know whether or not these superintendents of these mills are in that agreement? There is no agreement. Well, tacit understanding? Courtesy. I expect they would extend the courtesy to us, if we were to request it; we would, I know. So, Mr. Green, if one applies to the Columbia Mills, and your inquiry showed that they have left the Granby Mill in a manner that was displeasing to it, raised any disturbance, left owing money, or like matters, then in view of that mill courtesy, state whether or not the Columbia Mills would give such a one employment?' I would say not. * * * The Court: Ask whether that would apply to the Granby Mill? It would apply to any mill that chooses to give us the courtesy. No understanding, simply over the phone, we ask if certain people left there regularly. * * * Who in the mill is held responsible for the employment and discharge of the help? The superintendent primarily, and the overseer secondarily. Then I ask you, that being true, if, whether or not it is true, that the superintendent of the Granby, Columbia Mills and other mills of Columbia, are in that understanding? Mr.

3—87

Shand: Speak of your own knowledge and confine your-self to 1907, please. I cannot confine myself to 1907; I was in New York at that time. * * * I mean this; you say that a tacit understanding existed prior to the time you left here? Yes. Is that tacit understanding still—is it still in effect? I cannot say it is or not; no occasion has arisen to make a necessity to use it, or to make a necessity to raise the question.

"Mr. Edmunds: If a case should arise, state whether or not from your position as agent of the Columbia Mills Company, or the agent here at the Columbia Mills Company, you would make use of that understanding? I certainly would.

"Mr. Parker: We object; he is asking the conclusion of the witness on a hypothetical question.

"The Court: I think that admissible. The charge is that the Granby Mill blacklisted this man, and the charges are, also, that, by that blacklist, he was unable to secure work at other mills. This testimony tends to show, if it be true, that he was blacklisted and that he could not secure employment at other mills. It is competent. * * *

"You say that when you left here there was this tacit understanding, on the part of superintendents of the mills? Yes, sir. * * * This tacit understanding between the superintendents, was it anything more than an agreement to stop that practice of trying to get the help from other mills; is not that what you are thinking about? No; it was more of mutual protection from undesirable employees. We advanced, and I suspect other mills did the same thing, money to help them when they needed it, and we required them to give notice two weeks duration, before ceasing term of service with us; if they left before serving out the notice, they often left owing money, and we would have no chance of collecting it. This understanding, tacit understanding, we had with other superintendents. * * * What do you mean by tacit? I think I explained that more fully in stating mutual courtesy. It was not one mill agreeing with

another mill, but each particular superintendent did not care· to take hands from other mills, that had been discharged· from those mills for what reason? Did· not care to get undesirable help.   It was the habit more than a tacit under- standing?   I prefer to call it courtesy.   Just a courtesy of one mill to another?   One superintendent extending it to another; it was purely a mutual arrangement between the superintendents.   The courtesy consisted of your informing other mills, and asking information from other mills, and on that information to act upon it?   Or not, as we see fit. And it was courtesy on the part of other mills to give you information?   Yes, sir, and which we reciprocated on like occasions.   If they had heard there was a strike would they have asked whether the party applying was in that strike or not?   They would not have waited to ask; they would instruct that nobody from that mill should be employed. * * * Well, now, when you would instruct those parties who had been on strike, or anything of that sort, should not be employed, would that instruction be in the interests of your own mill and for your own protection, or by reason of courtesy to other mills?   Absolutely for our own protection. And you could have employed them if you wanted to? Might, taking chances.   And if you did not employ, it was, entirely with an eye to your own interests?   Yes, sir. abso- lutely.   And there was no agreement or understanding to the contrary?   None whatsoever.   .

"Mr. Edmunds: But the courtesy existed and was a prac- tice?   The courtesy was to give information.   And it was practiced, was it not?   I don't think I can answer that point, as I do not practice it myself.   I can answer from hearsay. You can answer from general custom?   Yes, sir.   Well? Practice.   Mr. Green, the mill itself is a body corporate, and does not undertake to employ weavers, loom fixers and truckers?   We hold the superintendent responsible for the mill help.   Those matters are left in charge of them? Absolutely.   And the mills recognize their authority to do

these acts? They hold them responsible for doing these acts."

O. M. Rhodes, the plaintiff, thus testified: "After seeing Mr. Wallace, where did you go? Went back home. and then to the Granby Mills office to see Mr. Black. State what conversation took place between you and Mr. Black, at the Granby Mills office, when you returned, after having seen Mr. Kirby, and after having seen Mr. Wallace? * * * I asked if he would not give Dozier and Hoyt work; if he would not give Harley and myself work; that we had nothing to do with the strike; wouldn't he give us work back? You asked if he would not give you work, if he would not give you and your boys work? Yes, sir. What response did he make to that? He would not do it. Did any further conversation take place between you at that time? Yes, sir. Please relate it. Then I asked him if he would not do that, to give me a pass to the Columbia Mills; that Mr. Wallace would give me work, if he would release our names off the list, and if he would hold no claim over us; and his remark was, 'I could not do that, if I was ever so willing; you are in the hands of the American Cotton Association.' At that time, did you tell him the result of what had taken place between you and Mr. Wallace? Only I told him that Mr. Wallace said, he would give me work; would be glad to have us, if he would give us the pass. State whether or not, at that time, you said anything to Mr. Black, the superintendent of the Granby Mill, about your name being on any list furnished to Mr. Wallace. I told him if he would release our names off that list, Mr. Wallace would give us work. * * * Mr. Edmunds: Coming back to the time when you went to see Mr. Wallace, please state to the Court and jury, exactly what took place between you and Mr. Wallace, what you said and what he said * * *? I told him we had nothing to do with the strike at the Granby Mills; that two of my boys was in that; went out with the weavers, but my daughter and myself had nothing to do with it. and asked

couldn't he give us work under the circumstances. What did he say? He said if I would go back to the Granby Mill and work, that he would be glad to hire us, or if Mr. Black would give me a transfer, stating that he would release our names from off the list, and that they held no claims over us whatever, that he would be glad to hire us, but otherwise he could not do it. * * * You did not get any work from that time, until you went to Danville, Va.? That is the only place that I applied for a job that I could get; that happened to be an independent company, that did not belong to the American Cotton Association, and, therefore, they had the right to hire whom they pleased."

L. E. Rhodes, a witness for the plaintiff, testified as follows: "Did Mr. Wallace give Mr. Rhodes any reason, which related to any act of the Granby Cotton Mill, why he could not give him employment? He did. Please state it. Mr. Wallace said that Mr. Black informed him on the morning of the strike, and told him he had trouble, and not to hire any of the help, and about three days later, he sent him a list of names of loom fixers, known as blacklist, and later he sent him a list that was known as an additional list, and he told father, if he would get Mr. Black to release his name off the list, that he would give him employment, for him and his whole crowd, and be glad to get them; that was pretty much the words Mr. Wallace used."

Dozier Rhodes thus testified in behalf of the plaintiff: "Now, after this strike took place, did you have any conversation with Mr. Black, the superintendent of the Granby Cotton Mill, about going back to work, about your going back to work, and about your father and his people going back to work? I had a little conversation with him, about giving me a pass to the other mill, and he said: 'I have got nothing to do with giving you a pass; I did not tell you all to quit, and I would not give a pop of my finger to keep you from getting work, but if the president should find out you is working, you will be turned right off.' He said this

American Cotton Mill business has got money. And I went to the Capital City Mills, after he would not give me a pass; I went to the Capital City Mill and I asked Mr. Ed Thomas for work and he said, 'Where are you from?'

"Mr. Shand: We object; he is not the plaintiff.

"Objection sustained."

The objection to the testimony had reference to the last question, as the defendant had permitted similar evidence to be introduced, during the examination of L. E. Rhodes as a witness, without objection.

T. B. Wallace, superintendent of the Watts Mills, thus testified in behalf of the defendant: "If one comes to you as a striker, as one who has struck, would you consider him as a suitable employee? Not in my business. Would you wish to employ such a person? No, sir. Is it or not to the interest of the mill, that such a person should not be employed? That is my position. Is that generally recognized among mills? That is recognized among mills. If one comes to you as a striker, and you are satisfied that the cause of striking is unjustifiable, and that he is an unsuitable employee, would you employ that man? Most emphatically no. Suppose you heard there was a strike, would you or not pursue the inquiry as to what it was about, who were the strikers, and how many? Yes, sir; I think we would. If you were to get that message, what was the natural thing for you to do; when you got the message that there was a strike? To protect my own interests, I would try to find out who the strikers were. If you had their names, if the names were given to you, in response to the request, what would you do? I would instruct my overseers not to employ them. Do you remember receiving a list of the strikers at the Granby Mill, being handed to you at any time? If my memory serves me right, there was a list that came to the Duck Mill, and I think that list fell into the hands of Mr. Ball, but I was acquainted with the facts before I received that list. Was that on the day of the

strike, or after the strike?.. That was on the day of the strike; I do not know what day the list came in, but I was in possession of the .facts of the strike, before receiving the list. As soon as you were in possession of the facts, did you or not give orders about it? I did. Did you or not give orders before you received the list? I had. What were the orders? I gave instructions to the overseers, not to employ any of the strikers of the Granby Mill. Were those orders given of your own discretion, in the course of your duty, or not? They were."

W. A. Black, superintendent of the Granby Mills, testified in behalf of the defendants, as follows: "If you knew a man was a striker, and had struck for an unjustifiable cause, would you or not employ that man? I would be afraid to employ a man who had that reputation. Did you sometimes have a request from mills, to give a list of employees who had struck; did you or not have such requests; and, if you knew of a strike, would you or not wish to know who were the strikers? Well, yes, sir."

J. H. M. Beaty, general manager of the Granby Mills, and a witness for the defendant, thus testified: "How long after the strike before these lists were prepared? I couldn't say, positively; I don't think it was over three or four days. You know, as a matter of fact, that a number of people who were on these lists, were refused employment on that account, do you not? . I can't say that I do, positively."

It will be observed that the foregoing testimony is of two kinds—direct and circumstantial. Even though it be conceded, that the direct testimony only tended to prove that the defendant and other mills sustained towards each other a relation, denominated a courtesy or understanding, but that it did not tend to show an agreement, that they would not employ those blacklisted by any other mills, still it does not follow, that there was error in refusing to grant a nonsuit, direct a verdict, or order a new trial. If the circumstantial evidence tended to show, that the relation which the mills

sustained towards each other was so intended, and did have the direct effect of preventing those who were blacklisted by one mill, from getting employment at the others, then it would make very little difference, whether such relation was called a courtesy, or an understanding, or an agreement, as it is the result which is expected to follow from the relation, and not the name by which it is called, that characterizes it. *Blackwell* v. *Mtg. Co.,* 65 S. C., 105, 43 S. E,. 395.

In other words, a person is presumed to intend the natural consequences that may reasonably be expected to result from his act. *State* v. *Chemical Co.,* 71 S. C., 544, 51 S. E., 455. Therefore, if the plaintiff was prevented from getting employment at the other mills, as the direct or proximate result of being blacklisted by the defendant, then it could reasonably be inferred that there was such an understanding or agreement between the mills, as naturally to cause such result, and such understanding or agreement would in effect constitute a conspiracy—the name by which it was called being immaterial.

In considering the circumstantial evidence, even if no single fact is sufficient to establish, *prima facie,* a conspiracy, nevertheless, when the several circumstances are considered together, they may have such effect.

The rule is thus stated in *Dantzler* v. *Cox,* 75 S. C., 334, 55 S. E., 774: "The ninth exception assigns error in overruling the motion for a new trial, on the ground that there was no testimony to support the verdict. While there was no direct and positive testimony sustaining the defenses set up in the answer, still there were facts and circumstances, from which the jury might properly have drawn the inference, in favor of said allegations. The rule is thus stated in *Railroad* v. *Partlow,* 14 Rich., 237: 'It may be that no one of the facts would of itself warrant the inference, and yet, when taken together, they may produce belief, which is the object of all evidence.' In 1 Greenleaf Ev., sec. 51a, it is said: 'It is not necessary that the evidence should bear

directly upon the issue.   It is admissible, if it tends to prove the issue, or constitutes a link in the chain of proof, although alone it might not justify a verdict in accordance with it. All the circumstances mentioned in this ground may be regarded as links in the chain of proof, from which the jury might deduce the inference of the defendants' privity and direction in the acts of trespass.   This is usually the case, where an issue depends on circumstantial evidence."   This principle is affirmed in *Wertz* v. *Ry.*, 76 S. C., 388, 57 S E., 194.

The circumstances tending to show a conspiracy are : (1) The keeping of a blacklist by the mill discharging the employee, not only as a matter of information for itself, but also for the benefit of those mills, with which it sustained a certain relation denominated a courtesy or understanding; (2) the fact that as a result of such courtesy or understanding, a discharged employee was prevented from getting employment at any of the other mills.

These facts, at least, tended to establish an implied agreement, which was in effect a conspiracy, and the exceptions raising this question are overruled.

As the appellant's attorneys concede that the charge of the presiding Judge, upon the question of conspiracy, was free from error, it is unnecessary to discuss the law upon that phase of the case.

Having reached the conclusion, that there was testimony tending to show a conspiracy, we proceed, lastly, to consider the twenty-first and twenty-fifth exceptions, which assign error on the part of the presiding Judge in refusing to charge, when requested by the defendant's attorneys, that the plaintiff was not entitled to punitive damages.   There are two reasons why the request to so charge was not erroneous: (1) The conspiracy alleged in the complaint imports an intentional wrong, and for such wrong punitive damages are recoverable.   *Pickens* v. *Ry.*, 54 S. C., 498, 32 S. E., 567.   (2) The refusal of the defendant to withdraw

the name of the plaintiff from the blacklist, after becoming aware of the fact that he was not a striker, and that he could not get employment at the other mills, while his name remained upon the blacklist, tended to prove malice.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.

MR. CHIEF JUSTICE JONES *and* MR. JUSTICE HYDRICK *concur in the result and in the opinion of* MR. JUSTICE WOODS.

MR. JUSTICE WOODS, *concurring in the result.* I concur in the result. It was not necessary that the evidence should show that the defendant had formed with other mills a conspiracy—a combination to do an unlawful thing or a lawful thing in an unlawful manner—and had injured plaintiff by acts done in furtherance of such conspiracy. Had the Court instructed the jury to that effect the defendant would be entitled to a new trial, for there was no evidence of conspiracy between the defendant and other mills. There was evidence of an agreement or combination among the mills to furnish to each other the names of strikers and other persons whose presence at the mills would for any cause be undesirable. But such a combination of employers is no more unlawful than similar combinations of laboring men not to work for certain persons regarded as unfair in their dealings with their employees. As long as such combinations are entered into and used for promoting the legitimate business purposes of those concerned, others have no cause of action on account of the combination, although the effect of it may be to injure them; but when the combination is made an instrumentality of injuring others through malice or threats or intimidation, a right of action arises for the resulting injury. When more than one of the parties to the combination agree to using the combination for such illegitimate purposes, a conspiracy

arises; and when one against whom such conspiracy is directed suffers injury in consequence of it, he has a right of action against one or all parties to the unlawful agreement, charging them as conspirators. The plaintiff's action does not fail because there was no evidence of such a conspiracy between two or more of the mills, for one of the parties to a legitimate combination or agreement gives a cause of action by using maliciously such a combination as a means of injuring another person. These principles are now generally recognized by the Courts of this country. *Wabash Ry. Co.* v. *Young,* 4 L. R. A. (N. S.), 1091, note; *Gray* v. *Building Trades Council,* 103 Am. St. 477, note; 1 A. & E. Annotated Cases, 172, note.

The main question involved in the trial of this case was whether defendant's officers had willfully perverted a lawful combination between itself and other mills so as to inflict injury on the plaintiff; stated more specifically, did the defendant, with knowledge that the plaintiff was not a striker, put his name on a list of strikers sent to other mills, or with such knowledge refuse to take plaintiff's name off the list, and thus willfully prevent his employment by other mills? The Court did not charge that proof of a conspiracy was necessary to a recovery, but that the case was staked on an alleged *combination* or conspiracy between the defendant and other cotton mills. The jury might well have found a verdict for the plaintiff upon reaching the conclusion that there was no conspiracy with other mills, but a lawful combination with them, perverted by the defendant in the way above indicated, to the injury of the plaintiff. The Court charged in effect that it was not sufficient for the plaintiff to prove that he was injured by a combination not to employ strikers, because such a combination was lawful, but that the plaintiff must go further and show that the defendant maliciously perverted such combination to the injury of the plaintiff.

The language of the charge in this connection was: "As a matter of law, the right of employers to combine for blacklisting purposes, or of an employer to circulate a blacklist among its various employing agents, seems to be, *in the absence of malice,* undoubted. But the presence of that element, according to the trend of the decisions, gives the injured employee a right of action."

The testimony quoted in the opinion of Mr. Justice Gary, while not tending, as it seems to me, to show a conspiracy, was evidence from which the jury could infer that there was a lawful combination not to employ strikers, and that defendant, after knowledge that plaintiff was not a striker, willfully persisted in representing him to be one, with the resulting injury that he was unable to obtain employment.

It follows that the plaintiff's contention, that the verdict of the jury was contrary to the charge of the Court, cannot be sustained.